DELTA PLASTICS CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1919–68. Filed June 16, 1970.

*Morton M. Stotter*, for the petitioner.
*Frank E. Wrenick*, for the respondent.

OPINION

HOYT, *Judge:* Respondent determined a deficiency in petitioner's income tax for the taxable year ended February 28, 1965, in the amount of $24,856.62.

---

The sole issue presented for our decision is whether a bona fide debtor-creditor relationship was created between a certain party and petitioner so as to justify a subsequent $77,000 bad debt claim as part of the net operating loss applied by petitioner against its taxable income for the year ended February 28, 1965.

The facts have been fully stipulated. The stipulation of facts and exhibits thereto are incorporated herein by this reference.

At the time the petition herein was filed, petitioner's principal place of business was at Crawford Street, Carey, Ohio. Its income tax return for the taxable year ended February 28, 1965, was filed with the district director of internal revenue, Cleveland, Ohio.

Delta Plastics Corp. (hereinafter referred to as Delta) was incorporated in the year 1950 to engage in the manufacture and sale of molded-plastic household and toy items.

Initially, Delta was incorporated under the name of Universal Molding, Inc. (hereinafter referred to as Delta), but changed its name to the present one in 1964.

Upon incorporation, there were four individual shareholders, but through a series of stock redemptions and purchases, Howard Rome remained as the sole stockholder as of January 1, 1959.

On March 23, 1959, Rome entered into an agreement with Stanley Marks and Ethel M. Marks, whereby Rome agreed to sell his stock interest in Delta to the Markses for a total purchase price of $200,000. After the deduction of various items, for which credits were specifically allowed in the contract, the net purchase price for the stock was $168,729.07, $100,000 of which to be paid in cash upon the transfer of the stock, and the balance, as evidenced by separate corporate promissory notes, with Stanley and Ethel as cosigners, to be payable in 24 monthly installments, including interest at an annual rate of 5 percent.

Following the execution of the agreement, the books and records of Delta were turned over to Marks and he assumed control of the corporation, including the authority to sign checks on the corporate bank accounts.

Marks withdrew by check $67,000 and $33,000 on March 26, 1959, and March 30, 1959, respectively, from Delta. The detachable memorandum accompanying the $67,000 check had the notation of "Loan" typed on it. The detachable memorandum accompanying the $33,000 check had the notation of "Purchase of Stock" typed on it. The $100,000 ($67,000 + $33,000) was deposited to the personal account of Marks, who in turn wrote a check to Rome for $100,000. Rome was cognizant of the fact that Marks withdrew the $100,000 from Delta in order to make this initial payment on his personal obligation under the agreement of March 23, 1959.

This $100,000, plus two subsequent disbursements to Marks by Delta of $1,000 each, was initially charged on the books of Delta as accounts receivable due from Marks. Marks never gave any notes to the corporation evidencing the receipt of the $102,000; nor did he ever pay any interest on the $102,000 disbursed to him. He never transferred any collateral to Delta as security for the repayment of these disbursements to him.

The corporate promissory notes payable to Rome, which were to cover the 24 monthly installment payments due under the March 23, 1959, agreement, were executed by Delta on March 30, 1959, but held by Delta until June 10, 1959, at which time they were delivered to Marks. Marks signed a receipt on that date which read as follows:

I am taking 24 notes executed by Stanley J. and Ethel M. Marks as individuals and S.J.M. as President of Corporation, each for $2,900.00, each dated March 30th 1959 bearing 5% per annum due successively beginning May 10, 1959 final note for $2029.07 payable April 10, 1961 payable to H. R. Rome.

(S) STANLEY J. MARKS

The record fails to reveal whether Marks ever delivered the aforementioned notes to Rome.

Upon assuming control of Delta, Marks dismissed the accounting firm then employed by Delta, and another C.P.A. was retained to audit the company books. Some time during the taxable year ended February 29, 1960, the new accountant eliminated the $102,000 receivable due from Marks and transferred this amount to an account identified as "Treasury Stock." No stock was ever purchased or redeemed in connection with this adjustment.

Shortly after Marks assumed control of the corporation, Delta experienced financial difficulties. For the taxable year ended February 28, 1959, Delta sustained an operating loss of $57,799.75. For the taxable year ended February 29, 1960, it sustained a further net operating loss of $108,660.75, and as of February 29, 1960, it had a surplus deficit of $163,114.16, resulting from the operating losses and other adjustments to surplus.

No payments were made to Rome under the agreement of March 23, 1959, other than the amounts (totaling $100,000) referred to above.

Some time during March or April 1960, the corporation ceased operations and the creditors placed the company in bankruptcy under chapter XI of the Federal Bankruptcy Act. At this point of time, Marks relinquished his control over the administration and operations of Delta, including, *inter alia*, signing Delta's Federal income tax returns and the checks drawn upon its bank accounts.

Upon placing Delta in bankruptcy, the creditors solicited the services of Rome to operate the company until such time as a plan for

payment of the outstanding debts satisfactory to all creditors could be accomplished. Rome agreed to return to the company to take over the management, provided that he would be able to regain the stock of the corporation. The stock was returned to Rome and he retained the cash he had previously received. Rome also entered into an agreement with Marks and his wife, whereby Rome was released from all claims and liabilities that the Markses might assert against him.

The plan of arrangement filed in bankruptcy contained a financial statement of Delta's assets and liabilities. No account receivable from Marks in any amount was included among the listed assets of Delta.

Under authority of the bankruptcy court, Rome took over the operations of the corporation and entered into an agreement with the creditors whereby Delta would pay them over a 3-year period 25 percent of the outstanding accounts due. During the following 3 years of operation, the creditors were, in fact, paid off at the agreed 25-percent rate.

Simultaneously with the corporation being placed in bankruptcy, Delta filed a suit against Marks in the amount of $124,000, $100,000 of this amount representing the two checks ($67,000 and $33,000) withdrawn by Marks in March 1959.

In the petition filed with the District Court, Marks was charged with withdrawing $124,000 with intent to defraud the creditors. The case was brought to trial during 1963. Neither Delta nor the creditors made an appearance before the court and the case was therefore dismissed. The suit against Marks was not pursued as it was concluded that Marks did not have sufficient assets against which any judgment could be satisfied.

After Rome regained the stock of Delta, he hired a new firm of accountants, which prepared the corporate returns for the fiscal years ended February 28, 1961, through February 28, 1963.

Delta's corporate tax return for its fiscal year ended February 28, 1961, reflected a "Treasury Stock" account with a beginning and ending balance of $102,000. The return for the fiscal year ended February 28, 1962, however, did not reflect any balance, or the existence, for that matter, of the aforementioned account. This return also reflected a $77,000 increase in the beginning balance of the deficit of the earned surplus account over the ending balance of this same account reported in the return for the preceding taxable year. The beginning balance of the notes and accounts receivable account, as reported on this return, reflected an approximate increase of $25,000 (exactly $24,926.16) over the ending balance of this same account reported in the return for the preceding taxable year.

Delta's corporate tax returns for the taxable years ending February 28, 1960, through February 28, 1965, do not reflect in any speci-

ficity the existence of an account receivable due from Marks. None of these tax returns report any bad debt deductions.

Delta claimed a net operating loss deduction of $118,572.59 in its Federal income tax return for its fiscal year ending February 28, 1965, which included $77,000 of the $102,000 withdrawn by Marks.[1]

In his notice of deficiency to petitioner with respect to the taxable year ended February 28, 1965, respondent disallowed $77,000 of the net operating loss deduction claimed for that year, explaining, *inter alia*, "that the bad debt deduction or loss of $77,000 resulting from the transfer of funds to Stanley J. Marks in the taxable year ended February 28, 1961, is not allowable under [s]ections 166 and/or 165 of the Internal Revenue Code [of 1954] because it has not been established that a debtor-creditor relationship was intended by the transfer or that any loss was sustained."

Section 166(a)(2)[2] provides, essentially, that a deduction may be allowed to the extent that a debt has become partially worthless. Section 1.166–1(c) of the Income Tax Regulations provides that only a bona fide debt—that which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money—qualifies for purposes of section 166. Whether a transfer of money creates a bona fide debt depends upon the existence of an intent by both parties, substantially contemporaneous to the time of such transfer, to establish an enforceable obligation of repayment. *Jacob Grossman*, 9 B.T.A. 643 (1927); *Estate of Carr V. Van Anda*, 12 T.C. 1158 (1949), affirmed per curiam 192 F. 2d 391 (C.A. 2, 1951); and *Evans Clark*, 18 T.C. 780 (1952), affirmed per curiam 205 F. 2d 353 (C.A. 2, 1953).

Respondent's notice of deficiency avers that the $77,000 bad debt deduction claimed by petitioner was not allowable because it had not been established that a debtor-creditor relationship was intended by the transfers in question. It is thus incumbent upon petitioner, initially to prove that a bona fide debt was created between itself and Marks. Petitioner has failed quite markedly to do so.

---

[1] (The corporate tax returns of Delta for the fiscal years ended Feb. 28, 1961, through Feb. 28, 1965, do not disclose for what taxable year, if any, an alleged $77,000 bad debt was originally claimed. While the return for the fiscal year ended Feb. 28, 1961, shows a net loss of $151,230.81, this amount was increased by $77,000 to $228,230.81 in the tax return for the fiscal year ended Feb. 28, 1962, without explanation. The increased figure is merely claimed as the net operating loss deduction "2/28/61." In his notice of deficiency, respondent refers to this amount as having been claimed as part of the net operating loss carryover from the taxable year ended Feb. 28, 1961. In his briefs, however, respondent, also without any explanation, refers to the taxable year ended Feb. 29, 1960, as the year in which the alleged bad debt occurred. Petitioner, on the other hand, both in its pleadings and on brief, contends that the alleged $77,000 bad debt was incurred in the taxable year ended Feb. 28, 1962.

[2] All section references, unless otherwise designated, are to the Internal Revenue Code of 1954, as amended.

The only evidence of record indicative of a debtor-creditor relationship consists of the notation of "Loan" typed on a memorandum accompanying the March 26, 1959, check of $67,000 to Marks and the initial reflection on petitioner's records of the total amount disbursed to Marks as accounts receivable, including the check of $33,000 with the typed memorandum notation "Purchase of Stock" attached. Bookkeeping and other related records, however, are not sufficient in and of themselves, without further substantiating evidence, to establish that a bona fide debtor-creditor relationship did in fact exist. *Kentucky Rock Asphalt Co.* v. *Helburn*, 108 F. 2d 779 (C.A. 6, 1940); *Elizabeth Lewis Saigh*, 36 T.C. 395 (1961); and *Jacob M. Kaplan*, 43 T.C. 580 (1965). Whatever evidentiary strength can be attributed to the establishment of an accounts receivable account from Marks is diluted by virtue of the fact that the new accountant hired by Marks eliminated the $102,000 account receivable and reclassified it as treasury stock.

All the other relevant evidence of record tends to point away from a debtor-creditor relationship. At no time did Marks give his personal notes to petitioner for the money withdrawn; nor did he ever agree to pay or pay any interest on the withdrawals. He never transferred any collateral to petitioner as security for the repayment of these disbursements to him. The stipulated facts do not disclose how Marks' ledger sheet, if any, in the corporate books treated his various withdrawals, and, as already noted, no asset for any such alleged debt was included in petitioner's list of assets in the 1960 bankruptcy proceeding.

Petitioner argues in the alternative that even if we cannot find that a debtor-creditor relationship was intended, the operation of Ohio State law, as applied to Marks' withdrawals, creates a bona fide for purposes of section 166. If it cannot be found that petitioner made loans to Marks, we must conclude, as petitioner not unreasonably contends, that the withdrawals were equivalent to dividends or distributions with respect to stock. Petitioner then points out various Ohio statutes (Ohio Rev. Code Ann. secs. 1701.33 (C) and (F), 1701.95 (C) (Page 1964)) which, in essence, make a shareholder liable to the corporation or its creditors for any distribution which is *knowingly* received at a time when the corporation is insolvent or there are reasonable grounds to believe that by such distribution the corporation would be rendered insolvent. Petitioner contends that the $102,000 withdrawn by Marks in March of 1959 occurred at a time when the corporation was insolvent, thus, in application of State law, rendering Marks liable to it in that amount.

Without passing on the validity of petitioner's ultimate conclusion that a bona fide debt was created for purposes of section 166 by vir-

tue of the operation of the State law here involved, we cannot determine, upon the facts of record, to what extent, if any, petitioner was insolvent, or rendered thereby, at the time of the withdrawals. Even if we could determine that insolvency was existent or resulted at the time of the withdrawals, we could not find on the record before us that Marks *knew* that the corporation was in such a state when the withdrawals were made.

The withdrawals in question occurred shortly after the close of the fiscal year ended February 28, 1959, during which time petitioner had sustained an operating loss of $57,799.75, thus creating a deficit in its earned surplus account of an approximate like amount. Taking into account Ohio's definition of "insolvent"—when a corporation is unable to pay its obligations as they become due in the usual course of its affairs (Ohio Rep. Code Ann. sec. 1701.01(O))—we find no basis indicative of this status at the time of the withdrawals in 1959, or as a result of them. A deficit in earned surplus does not necessarily indicate that a corporation is unable to pay its obligations as they become payable. The placing of petitioner in bankruptcy during March or April of 1960, a year later, does not by any means result in the conclusion, as petitioner asserts, that it was insolvent 1 year prior to this time when the withdrawals in question were made. What we can conclude is that petitioner has failed to prove, upon the rather scanty facts of record, that Ohio's law, dealing with unlawful shareholder withdrawals, has any application herein.

Accordingly, we conclude that no bona fide debtor-creditor relationship between Marks and his wholly owned corporation existed in 1959 when he used corporate funds to pay for Rome's stock. Respondent's determination, disallowing any bad debt deduction by petitioner for the withdrawals made by Marks, must be sustained, and this conclusion would follow whether the year in which such alleged bad debt occurred were fiscal 1960, fiscal 1961, or fiscal 1962.

*Decision will be entered for the respondent.*