HOWARD S. BUGBEE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bugbee v. Commissioner
Docket No. 1322-72
United States Tax Court
T.C. Memo 1975-45; 1975 Tax Ct. Memo LEXIS 329; 34 T.C.M. (CCH) 291; T.C.M. (RIA) 750045; March 3, 1975, Filed *329 Petitioner advanced funds over a period of 2 years to enable one Billings to develop prospective business ventures. Petitioner subsequently claimed a short-term capital loss in 1966 when these advances were not repaid. Respondent disallowed this loss on the ground that petitioner had not established the existence of a debtor-creditor relationship. Held: Debtor-creditor relationship has been established. Albert C. Lum, for the petitioner. Hector C. Perez, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT *330 AND OPINION STERRETT, Judge: The respondent determined a deficiency in petitioner's federal income tax for the taxable year 1966 in the amount of $7,242.68. Other issues having been conceded, the sole remaining issue [1] is whether petitioner has established the existence of a debtor-creditor relationship with respect to funds advanced by petitioner to one Paul Billings and thereby validated his claim to a short-term capital loss under sections 166(a) and 166(d), Internal Revenue Code of 1954. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner, *331 Howard S. Bugbee (hereinafter petitioner), resided in Honolulu, Hawaii at the time of filing his petition herein. Petitioner filed a "married filing separately" federal income tax return for the taxable year 1966 with the district director of internal revenue at Los Angeles, California. At all relevant times herein, petitioner was president and majority stockholder of Poop Deck, Inc., a California corporation operating a beer parlor in Hermosa Beach, California. The corporation's other shareholders were petitioner's then spouse Nancy Bugbee and William G. Garbade. Petitioner first met Paul Billings (hereinafter Billings) at his beer parlor in 1957. Their relationship was first that of proprietor and customer. Over a period of time their friendship grew and they talked of business ventures that Billings might pursue. Billings became godfather to one of petitioner's children. As a result of their conversations petitioner was impressed with Billings' abilities and thought he could turn his ideas into successful business ventures. Based on this impression, petitioner began to advance money to Billings. These advances were first evidenced by informal notes which were periodically *332 consolidated into larger, more formal notes. There were 11 notes in all representing $19,750 advanced by petitioner to Billings. These notes were all unconditional, unsecured demand notes signed by Billings between September, 1958 and December, 1960, and evidenced money actually received by Billings from petitioner. [3] The notes provided for interest at a rate of at least 6 percent, however no interest was ever actually paid. Billings has never repaid any part of the principal represented by these notes, although at trial he acknowledged these advances were still outstanding and evidenced an intention to repay them if possible. During this period when the *333 advances were made Billings was unemployed and he was basically unemployed between 1960 and 1966. Although petitioner knew Billings was unemployed between 1958 and 1960, petitioner neither investigated nor did he have any personal knowledge of Billings' financial position. Billings used the funds received from the petitioner to investigate various business ventures, although in fact much of the money was used by Billings for personal living expenses. Petitioner was aware of Billings' activities with respect to these ventures, but he did not participate in them. Petitioner's then spouse, Nancy Bugbee, was also aware that petitioner had advanced funds to Billings. Some of her personal funds represented the source of some of these advances. In 1966 petitioner and his spouse were divorced. In the interlocutory judgment of divorce entered June 23, 1966, by which the rights of the parties were established, no mention of the funds advanced by Nancy Bugbee was made. Petitioner expected to be repaid after Billings established one of these ventures, but such repayment was not conditioned on the success of any of these ventures. Through 1967 petitioner had periodic personal contact with *334 Billings and requested repayment of the notes without success. Petitioner, on his 1966 tax return, reported a "Personal Bad Debt-Paul Billings" and claimed a $19,750 short-term capital loss. This loss was used in its entirety to offset long-term capital gain recognized that year from other sources. Respondent disallowed this loss as follows: (b) It is determined that the bad debt deduction which you claimed on your return resulting from loans to Paul Billings is not allowable under Section 166 of the Internal Revenue Code because it has not been established that a debtor-creditor relationship was intended by the loans, the amount of the loans have not been established and it has not been established that the money loaned was your property. After the trial respondent filed a Motion for Leave to File Amended Answer to Conform the Pleadings to the Proof, pursuant to Rule 41(b) of the Rules of Practice and Procedure of this Court. In this motion respondent asserted that the testimony presented at trial raised the additional issue of whether the claimed bad debts became worthless in 1966. Respondent also filed an Amendment to Answer in which he requested that *335 his original answer be amended to include the above issue of worthlessness as a ground for denying petitioner's claim. Petitioner objected to this motion arguing that this issue was not raised at trial. Petitioner also objected on the grounds that this issue was not stated in the "Explanation of Adjustments" in the statutory notice received by the petitioner and that it should not be raised at this time. Petitioner asserted that if properly apprised of this issue, additional evidence with respect to it could have been presented at trial. Respondent's motion was denied by this Court. In his reply brief, respondent has conceded that the amount of the advances has been established, and that the money advanced was the petitioner's property. OPINION The case at bar presents for our determination the sole issue of whether petitioner is entitled to claim a short-term capital loss within the terms of sections 166(a) and 166(d)[4] and the accompanying regulations as a result of Billings' failure to repay the funds he had advanced him. Other requirements of these provisions having been previously disposed of, the only remaining factual issue is whether a debtor-creditor relationship *336 existed between Billings and petitioner at the time these advances were made. *337 To qualify under section 166 there first must exist a bona fide debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed and determinable sum of money. Section 1.166-1(c), Income Tax Regs. "Whether a transfer of money creates a bona fide debt depends upon the existence of an intent by both parties, substantially contemporaneous to the time of such transfer, to establish an enforceable obligation of repayment". Delta Plastics Corp.,54 T.C. 1287, 1291 (1970). This determination then is a question of fact to which the substance and not the form of the relationship between petitioner and Billings must be applied. Delta Plastics Corp.,supra.
Looking beyond the formal relationship between the petitioner and Billings, respondent has pointed out several factors that he believes amply illustrate his position. Respondent first argues that in reality these advances represented the money necessary to investigate prospective business ventures in which both men would share in the potential profits and as such do not represent loans. Petitioner's testimony with respect to this matter is not entirely *338 clear. At one point he stated that, if any of these ventures materialized, he "would be a part of it." Later, he stated that, although he expected to be repaid after one of these ventures was established, these advances were personal loans to Billings and that they were to be repaid from whatever sources Billings might have. Billings' testimony is more direct. He clearly stated that these advances were for his personal business ventures and that petitioner was not involved in them. Billings also acknowledged liability for these advances and evidenced an intention to repay if possible. There is also no indication in the record of an agreement under which petitioner would be entitled to share in the profits of any of these ventures. We reject this contention of the respondent. Respondent next argues that bona fide debts never existed since these advances were worthless when made and petitioner did not have a reasonable expectation that they would be repaid. In support respondent points out that during this period Billings was unemployed and had no independent means of support, that the loans were unsecured, that despite the failure of Billings to make interest payments on the first *339 notes additional funds were advanced, that the nature of Billings' proposed ventures was purely speculative, and that petitioner never sought repayment in court. Respondent does not question the wisdom of these advances. Anyway that determination could only be made with the use of hindsight, which in this instance is not an appropriate tool. As noted earlier our task is to determine the intent of the parties as it existed when the advances were made. Delta Plastics Corp.,supra. See Santa Anita Consolidated, Inc.,50 T.C. 536, 554 (1968). The record in this case does indicate that Billings was in poor financial condition when these advances were made. However this Court has said that this factor does not preclude a finding of the existence of a bona fide debt. Santa Anita Consolidated, Inc.,supra, at 553; Richard M. Drachman,23 T.C. 558 (1954). The use of unsecured notes reflects the nature of the risk involved that petitioner accepted. Any unsecured debt involves some risk, however this factor is not determinative. Santa Anita Consolidated, Inc.,supra at 552. This Court has said, *340 "For the advance to be a loan, it is not necessary that there be an unqualified expectation of repayment." Richard M. Drachman, supra at 562. In the final analysis the repayment of any loan depends on the success of the borrower. "The real differences lie in the debt-creating intention of the parties, and the genuineness of repayment prospects in the light of economic realities", Santa Anita Consolidated, Inc.,supra at 552. See also Earle v. W. J. Jones & Son,200 F. 2d 846, 851 (9th Cir. 1952). We have found that petitioner made these advances because he believed Billings could be successful and that he would be subsequently repaid. After a careful review of the record, we believe petitioner's motives were genuine and that they existed throughout the period during which these advances were made. Respondent maintains that, since Billings was in poor financial condition, in reality any repayment was conditioned on Billings' business success and, since that condition was never fulfilled, there never was an enforceable repayment obligation. For support respondent cites Zimmerman v. United States,318 F. 2d 611 (9th Cir. 1963). *341 In that case the taxpayer advanced money to an organization he was initiating. Repayment was to be made out of the dues collected from the members of this new organization. The organization faltered and the taxpayer was not repaid. The court held that the contingent nature of the repayment obligation alone precluded the finding of a bona fide debt. See also Alexander & Baldwin v. Kanne,190 F. 2d 153, 154 (9th Cir. 1951)(repayment "'only when, if and to the extent that; after all the indebtedness and liquidation costs of Waterhouse Company had been paid, there remained an excess of assets."); Bercaw v. Commissioner,165 F. 2d 521, 525 (4th Cir. 1948), affirming a memorandum decision of this Court ("* * * oral agreement under which petitioner agreed to advance the money necessary to carry on the litigation and the guardian agreed to pay petitioner from any funds recovered * * *.") The facts in the case at bar do not reveal that any repayments by Billings were conditioned on his ultimate success. Although petitioner expected to be repaid after Billings had established one of his ventures, we have found that petitioner was to be repaid from any assets *342 that Billings might have. Billings himself testified that these advances were personal, unconditional loans for which he was liable. Respondent finally argues that, since petitioner and Billings were close personal friends, these advances might be classified as gifts. Although the parties were friends, their relationship did not have a long history. There also was no blood relationship, although Billings was named godfather to one of the Bugbee children. Although the record does not indicate petitioner's financial condition during the period 1958-1960, the divorce decree issued in 1966 only describes assets of moderate value. We do not believe that petitioner's financial condition was such that he could make these advances without expectation of repayment. The facts do not support respondent's contention that these advances were gifts. Commissioner v. Duberstein,363 U.S. 278 (1960). We believe that petitioner has established the existence of a debtor-creditor relationship and that respondent's determination must be denied. Decision will be entered under Rule 155.
Footnotes
1. Petitioner also avers respondent has erred in disallowing a medical expense deduction claimed on the same tax return. However, this disallowance was due solely to the increase in petitioner's adjusted gross income caused by the disallowance of the claimed shortterm capital loss in issue. Petitioner has made no substantive allegations with respect to this disallowance. ↩
2. All statutory references are to the Internal Revenue Code of 1954 as amended, unless otherwise indicated.↩
3. A typical note provided as follows: $ 1000.00September 30, 1959ON DEMAND after date (without grace), I promise to pay to the order of Howard S. BugbeeOne Thousand and no/100 * * * Dollars, for value received with interest at Six per cent per from This Date until paid, interest payable Quarterly both principal and interest payable in lawful money of the United States. (signed) Paul Billings Paul Billings 1402 Strand Hermosa Beach, Calif.
No. Due On Demand↩
4. SEC. 166 BAD DEBTS. (a) General Rule.-- (1) Wholly Worthless Debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially Worthless Debts.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer, other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩