MASHUQ AHMAD QURESHI AND RUTH QURESHI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Qureshi v. Commissioner
Docket No. 30173-84.
United States Tax Court
T.C. Memo 1987-153; 1987 Tax Ct. Memo LEXIS 154; 53 T.C.M. (CCH) 414; T.C.M. (RIA) 87153; March 23, 1987. Mashuq Ahmad Qureshi, pro se. Marshall Feiring, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Taxable Year
Deficiency
1980
$25,967 1981
25,913
After concessions, the issues for decision are whether petitioners are entitled to deductions for (1) a bad debt or an ordinary loss with respect to the taxable year 1980, and (2) a theft loss with respect to the taxable year 1981. FINDINGS OF FACT Some of the facts have been stipulated and are so found. This reference incorporates the stipulations of facts and attached exhibits. Petitioners are husband and wife and resided in East Falls Church, Virginia at the time they filed their petition in this case. They timely filed joint Federal income tax returns for the taxable years 1980 and 1981 with the Internal Revenue *156 Service Center, Memphis, Tennessee. From 1978 through 1981, Mashuq Ahmad Qureshi ("petitioner") carried on a substantial medical practice. In January 1978, Gislaine Poffe ("Poffe") became petitioner's patient, and thereafter saw petitioner about one day a week for medical reasons. Poffe lived in the building where petitioner's office was located and helped petitioner, without payment, by performing a few chores for the office. During the late summer and early fall of 1979, Poffe and petitioner began to discuss the possible formation of a bath accessory business. On or about October 1, 1979, Poffe moved to California to be closer to her daughter who already lived there and to be with her friend, General Harold Strack, who had been recently transferred there. Petitioner gave her a check, dated September 17, 1979, in the amount of $10,000, to start the aformentioned bath accessory business, which Poffe and petitioner decided to name "Bath 'N' Things" ("BNT"). Prior to her move, petitioner also gave Poffe a Fiat 128 automobile and Poffe turned over her 1979 Buick LeSabre automobile to petitioner. Upon arriving in California Poffe began setting up BNT, and was responsible for *157 selecting the business' location, inventory, advertising, and accountant. On October 4, 1979, petitioner sent Poffe a letter in which he stated that Poffe had complete authority to sign on my behalf any papers or license application pertaining to our business venture which she will start in California on or about November 1, 1979. She will also have complete authority to make any decision that will arise concerning this business venture and will report to me on a monthly basis with the books concerning said venture. BNT opened for business in December of 1979. Petitioners filed a joint Federal income tax return for the 1979 taxable year that included a Schedule C reflecting the income and expenses for BNT and showing a net loss for the year of $8,477. Petitioner did not visit BNT during 1979, but Poffe did inform him of its progress. In addition to the original $10,000 petitioner sent to Poffe, petitioner transferred to Poffe during 1979 an additional $15,000 in order to get BNT going. Petitioner also transferred $5,000 directly to BNT during 1979 for the purpose of carrying on the business. Petitioner looked to recover the $30,000 transferred to Poffe and BNT in 1979 out *158 of expected profits. Petitioner did not look to Poffe for repayment of these amounts and did not receive any notes or any agreements concerning the payment of principal or interest. In addition, petitioner knew of no assets that Poffe had that would enable her to repay these amounts. Moreover, it was always understood that petitioner owned the business and that Poffe was only a salaried employee of BNT. Petitioner sent a letter to Poffe, dated January 1, 1980, which stated that BNT was being transferred to Poffe as her own business with ownership of all contents and with liability for all leases, expenses, bills, etc. Neither petitioner nor Poffe considered that this letter effected an actual transfer of BNT to Poffe or any change in their owner-employee relationship. Rather, the sole purpose of the letter was to enable Poffe to raise additional capital for the business in the form of loans from local banks. [1]
*159 On January 7, 1980 petitioner wired $5,000 to the bank account of BNT. On February 5, 1980 petitioner wired an additional $6,000 to BNT's account. With respect to both wire transfers, petitioner did not look to Poffe for repayment of these amounts and did not receive any notes or any agreements concerning the payment of principal or interest. Petitioner considered notes and security unnecessary because he considered Poffe to be his employee and not his debtor. As with the $30,000 advanced to Poffe in 1979 (see pp. 3-4, supra), petitioner looked to recover this $11,000 out of BNT's expected profits. About the time of these transfers, petitioner commissioned a consultant to determine whether BNT had the potential to be successful and was advised that the business was likely to fail. On March 25, 1980, the lease covering the premises occupied by BNT was transferred to Poffe. On May 28, 1980, petitioner gave a letter to Poffe stating that Poffe had paid petitioner the sum of $41,366.71 owed to him since February 18, 1980. However, no actual payment accompanied this letter and as with the paper transfer of BNT discussed on p. 4, supra, petitioner's purpose in providing *160 this letter was to enable Poffe to raise additional capital. On or about May 30, 1980, petitioner and Poffe entered into an agreement ("Agreement") in which Poffe agreed to repay petitioner $41,366.71 in exchange for being given full ownership of BNT. Poffe also agreed to sell an apartment belonging to petitioner and to use the proceeds in running BNT. Poffe agreed to repay petitioner the $41,366.71 and the proceeds from the sale of the apartment, at a rate of $12,000 principal and 6 percent interest per annum, commencing on January 1, 1981. BNT closed in June or July of 1980. From August through the end of 1980, petitioner sent Poffe additional funds in the form of checks totalling $4,100. At no time during 1980 did petitioner visit BNT. On October 24, 1980, Poffe filed for bankruptcy in her own name and under the name of BNT. Poffe's bankruptcy estate was a "no asset" estate, and in her schedule of unsecured claims Poffe listed a $48,000 debt to petitioner. This schedule listed total unsecured claims (including petitioner's) of $74,595. Poffe was declared bankrupt and her debts were discharged pursuant to a court order dated April 13, 1981. That order specifically referred *161 to Poffe as "doing business as BNT." In their 1980 return, petitioners claimed a deduction of $48,000 for a business bad debt arising from BNT. Petitioners conceded at trial that this $48,000 deduction included the $8,477 loss that had already been deducted with respect to BNT in petitioners' 1979 return. See p. 3, supra.
Petitioner met R. J. Gordon ("Gordon") in March of 1981. Gordon approached petitioner with several new investment opportunities and petitioner was persuaded to set up a business called M.A.Q. Associates ("MAQ") to invest in ventures organized by Gordon. On or about April 1, 1981, petitioner delivered 2 checks to Gordon. Both checks were drawn on the MAQ checking account maintained by petitioner at National Savings & Trust Company ("NS&T"). The first check, in the amount of $47,500, was payable to the order of the R.J. Gordon Corporation ("Gordon Corporation"), and was deposited with the Security National Bank ("SNB") on April 2, 1981. Petitioner delivered the check in payment for certain telephone equipment ("Equipment") which petitioner leased back to the Gordon Corporation. Petitioner financed the purchase with the proceeds of a personal loan from *162 NS&T. The loan was arranged by Gordon, was based on the financial strength of petitioner, and was collateralized by the Equipment and lease on the Equipment. Gordon purchased the Equipment from the Telephone Corporation of America ("Telcoa"). The second check delivered to Gordon, in the amount of $20,000, was payable to the order of Medac General Partnership II ("Medac II"). The check was delivered in exchange for two interests in Medac II. Although payable to Medac II, the second check was endorsed by Gordon, payable to an entity called Medtronics, Inc., and was deposited with SNB on April 2, 1981. Petitioner signed a partnership agreement with respect to Medac II, which was a District of Columbia general partnership formed on May 15, 1981. Paragraph 4 of the agreement provided, in part, that the business of Medac II would be the ownership, operation and leasing of certain computer hardware, software and systems. Paragraph 10.1 in the agreement provided, in part, that MEDAC, Inc. would manage the business of Medac II. Paragraph 12 provided that Medac II would maintain a bank account at NS&T and that checks drawn on the account would be signed by MEDAC, Inc. On May 26, 1981, Medac *163 II opened an account at NS&T. Gordon was authorized to sign any and all checks on behalf of Medac II. On June 30, 1981, Mr. Schwarzwald ("Schwarzwald"), a vice-president of Telcoa, and Mr. Yelatalo, Telcoa's president, removed the Equipment from Gordon's offices with the help of some technicians from Telcoa. The police came but did not prevent the Equipment from being removed. Gordon left the Washington area and was unavailable after the latter part of June 1981. Prior to leaving, Gordon was making the lease payments on the Equipment. After July 4, 1981, petitioner was informed that Gordon had left and soon thereafter retained an attorney named Daniel O'Connell ("O'Connell") to look into Gordon's disappearance and the prospects of recovering the money he had invested with Gordon. O'Connell discussed the situation with NS&T, FBI agents and at least one other attorney, and contacted Schwarzwald with respect to Telcoa's repossession of the Equipment. Schwarzwald rejected O'Connell's claim that the Equipment belonged to petitioner and informed O'Connell that the Equipment had been repossessed because Telcoa had received only partial payment from Gordon with respect to the Equipment's *164 purchase price. By early August, based on these preliminary investigations, O'Connell suspected that persons other than Gordon might be liable to petitioner, namely the two banks involved in making the loan to petitioner and processing the checks from which Gordon received petitioner's funds, as well as Telcoa. However, O'Connell advised petitioner that (1) developing evidence and doing research to determine the validity of these suspicions would be expensive and might prove fruitless; and (2) the entities which might be liable for losses would be resistant to claims and that litigation would be prolonged and expensive. Thereafter, petitioner ceased retaining O'Connell's services and obtained the information O'Connell had gathered during his efforts on petitioner's behalf. In July 1981, petitioner also contacted Robert Lavery ("Lavery"), a loan officer at NS&T, and requested from him the documents used in connection with the loan that financed petitioner's purchase of the Equipment. Lavery sent the documents to petitioner on July 9, 1981. In 1981, petitioner also contacted Robert Willey ("Willey"), a vice president at NS&T. At that time, Willey refused to provide petitioner *165 with the signature cards for Medac II. On February 22, 1982, petitioner again contacted Willey and again requested the signature cards for Medac II. In a letter, dated March 12, 1982, Willey provided petitioner with the signature cards and Medac II's certificate and authorization. These documents indicated that the Medac II account was not opened until May 26, 1981 but that Gordon was an authorized signer of checks for Medac II. Thereafter, petitioner went to visit Mr. David Duliber at the Office of the Comptroller of the Currency, who advised him that the endorsement on the Medac II check was improper and suggested to petitioner that he retain the services of an attorney. Accordingly, petitioner engaged the services of Mr. Mark Sandground ("Sandground") because he had heard that Gordon was now in jail and that Sandground had previously interviewed him there with respect to other matters. Petitioner also contacted the U.S. Attorney for the District of Columbia who informed petitioner that he would not prosecute the case because it was a civil matter. Petitioner engaged Sandground for only a short time and, in May 1982, retained 2 private investigators, Antonio Braun and Ginny *166 Brown. Petitioner and the investigators approached representatives of NS&T claiming that NS&T had been at fault with respect to honoring the Medac II endorsement and for approving the Equipment loan in light of Gordon's allegedly fraudulent activities. NS&T's representatives denied any wrongdoing on the bank's part, and the investigators then contacted Peter Leyton ("Leyton") on petitioner's behalf. Leyton was a practicing attorney and, on or about April 1, 1982 agreed to represent petitioner in trying to recover sums on behalf of petitioner with respect to Gordon, Gordon Corporation, NS&T, SNB and Telcoa. In the summer of 1982, Leyton met with Phyllis Archer ("Archer"), whose name had been given to him by Antonio Braun. Archer had been a personal assistant and secretary to Gordon in the fall of 1980 and the spring of 1981. Archer was aware that petitioner had paid for the Equipment and that the Equipment had been installed in Gordon's offices. Furthermore, Archer had maintained a check ledger while working for Gordon, which reflected a $24,000 payment to Telcoa for the Equipment. In July 1982, Leyton met with Schwarzwald and Stanley Lipschultz ("Lipschultz"), an attorney *167 for Telcoa. Lipschultz and Schwarzwald were not willing to make any settlement at that time, but gave Gordon's ledger to Leyton. Leyton had also contacted representatives of NS&T on behalf of petitioner. Leyton felt that petitioner had valid claims but they would be difficult to establish. However, petitioner was not able to pay Leyton any more fees and Leyton was not prepared to represent petitioner on a contingency basis, and their relationship terminated on or about August 31, 1982. Leyton turned all his records, including the ledger, over to petitioner. On December 28, 1982, petitioner commenced a pro se action against NS&T, SNB and Telcoa in the United States District Court for the District of Columbia. On or about March 23, 1983, petitioner's motion to add Gordon as a party defendant was granted. The action against Gordon has yet to be tried. On or about August 11, 1983, SNB filed a motion for summary judgment. SNB withdrew this motion and on or about July 26, 1984 there was a trial of petitioner's actions against SNB. Judgment was for SNB. Petitioner appealed to the United States Court of Appeals for the District of Columbia Circuit. On May 7, 1985, the Court *168 of Appeals dismissed petitioner's appeal for want of a final judgment. The Court of Appeals stated that, after final judgment was entered in the district court with respect to all the claims and parties in the case, petitioner would have an opportunity to present any claims he might have on appeal. By order of the District Court, dated November 18, 1983, Telcoa's motion to sever and have a separate trial for petitioner's claims against it was granted. On or about August 29, 1985, petitioner won a jury verdict in the amount of $17,440 against Telcoa. [2]
OPINION The first issue is whether petitioners are entitled to either a bad debt deduction under section 166[3] or a deduction for an ordinary loss under section 165. Petitioners contend that the May 30, 1980 Agreement between petitioner and Poffe established a bona fide debtor-creditor relationship and that as a result of Poffe's subsequent bankruptcy the debt became worthless and *169 petitioners are thus entitled to a bad debt deduction for the 1980 taxable year. Respondent, on the other hand, argues that the owner-employee relationship between petitioner and Poffe was never altered and that no valid debt was ever created between them, and that the Agreement was merely a device to shield petitioner from BNT's creditors. Moreover, respondent contends that petitioners are not entitled to any deductions for the losses allegedly incurred by BNT because such losses cannot be substantiated or approximated. For the reasons discussed herein, we agree with respondent. Section 166(a) provides that "[t]here shall be allowed as a deduction any debt which becomes worthless within the taxable year." To be entitled to such a deduction under section 166 there must exist a bona fide debt "which arises from a debtor-creditor relationship based upon a *170 valid and enforceable obligation to pay a fixed or determinable sum of money." Section 1.166-1(c), Income Tax Regs. Moreover, "Whether a transfer of money creates a bona fide debt depends upon the existence of an intent by both parties, substantially contemporaneous to the time of such transfer, to establish an enforceable obligation of repayment." Delta Plastics Corp. v. Commissioner,54 T.C. 1287, 1291 (1970). The burden of proving that such a debt exists is on petitioners. Zarnow v. Commissioner,48 T.C. 213, 218 (1967); Rule 142(a). Petitioners' position is essentially based on the existence of the Agreement, which petitioners would have us believe is evidence of the loan, and petitioner's own self-serving statements as to the bona fides of the transaction. However, in light of the totality of the other evidence we have seen and heard, we are convinced that no bona fide debt was ever intended to be created between Poffe and petitioner, and accordingly we find that petitioners have failed to carry their burden of proof. To begin with, petitioner has conceded throughout the course of this litigation that, at all *171 times prior to the Agreement, he was the sole owner of BNT and Poffe was no more than his employee, that he never looked to Poffe for repayment of the $41,000 he advanced to her to run the business, and that he expected to recover these amounts solely out of the future profits of BNT. Under these circumstances, we think it strange indeed that Poffe would suddenly agree to be personally liable for these amounts. Moreover, we think the fact that petitioner continued to send Poffe funds totalling $4,100 even after the Agreement was signed, allegedly to help Poffe wind down the business and institute bankruptcy proceedings, is further evidence that petitioner was still the owner of BNT and that the Agreement was not evidence of debt and a transfer of BNT to Poffe, but rather, as respondent contends, merely a device petitioner used in an attempt to shield himself from BNT's creditors. [4] We think the fact that petitioner admittedly transferred BNT to Poffe on paper once before (see letter of January 1, 1980, p. 4, supra), solely for the purpose of persuading local banks to treat her as BNT's owner so that she could acquire additional capital in the form of loans, lends credence to *172 such a conclusion. Furthermore, General Strack, who was a close friend of both Poffe and petitioner and familiar with the ongoing business relationship between the two, testified that, at all times during the course of the business, petitioner was the owner of BNT and Poffe was his employee, and that this relationship had never changed. Finally, even assuming arguendo that petitioner intended to transfer BNT to Poffe, "debts may not be deducted as bad debts unless they had value when acquired or created." Pierson v. Commissioner,27 T.C. 330, 338 (1956), affd. 253 F.2d 928 (3d Cir. 1958). Similarly, a taxpayer who extends credit with knowledge that he will not be paid is considered to have *173 made a gratuity and not to have created a debt. See Putnam v. Commissioner,352 U.S. 82, 88 (1956). At the time Poffe agreed to repay petitioner the $41,366.71, petitioner was well aware that the business was failing and that the prospect of BNT generating any revenues to repay the "loan" was highly unlikely. Moreover, petitioner required no security for the "loan," although he was quite aware that Poffe had no assets to speak of and no visible means of support other than BNT. Thus, it seems obvious to this Court that the purported debt had no value when it was allegedly created and that petitioner never intended to be repaid. Cf. C.M. Gooch Lumber Sales Co. v. Commissioner,49 T.C. 649, 659 (1968). Accordingly, we find that no debt was in fact created by the execution of the Agreement and that respondent properly disallowed petitioners' bad debt deduction. We also find that petitioners are not entitled to a deduction for an ordinary loss under section 165. Section 165(a) provides, as a general rule, that "[t]here shall be allowed as a deduction *174 any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(c) provides, in pertinent part, that In the case of an individual, the deduction under subsection (a) shall be limited to -- (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; Respondent has not sought a disallowance of petitioner's claimed deduction on the grounds that petitioner's activities with respect to BNT did not constitute the carrying on of a trade or business or that petitioner was not engaged in an activity entered into for profit. Similarly, respondent does not dispute that petitioner transferred to Poffe and/or the account of BNT some $45,100 during 1979 and 1980, or that BNT was a viable business entity through June, 1980. Rather, respondent argues that petitioners have not demonstrated that the funds sent to Poffe, or a determinable portion thereof, were used in connection with the business of running BNT and therefore petitioners have failed to prove that they are entitled to deduct these amounts as business losses -- a burden which lies squarely on *175 petitioners' shoulders. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). We agree with respondent. Petitioners have offered no evidence to substantiate their claims that the funds transferred to Poffe were in fact expended in the furtherance of petitioner's business. Petitioners have not only been unable to produce BNT's books and records, but petitioner admitted that he has never seen them and does not even know if they exist. Petitioner had never visited the store, has never seen its lease or produced it at trial, and even his own notes with respect to BNT's rent and Poffe's salary were based upon Poffe's alleged representations to him. Moreover, we were not able to benefit from the testimony of Poffe because petitioner informed us that she was unavailable for the trial. The fact of the matter is that, given our holding that BNT was at all pertinent times the business of petitioner, any loss would be the loss of that business deductible in the same manner in which petitioners claimed such a deduction for 1979. We have no doubt that petitioner advanced substantial funds to the business of BNT and that BNT had substantial expenses in 1980, but we have *176 no way of knowing to what extent the expenses were offset by receipts or whether any of the funds were expended for purposes not properly attributable to the business of BNT. See Stuart v. Commissioner,38 B.T.A. 1147, 1153 (1938). Moreover, in view of the fact that the order discharging Poffe from bankruptcy described her as "doing business as BNT," it would appear that petitioner was relieved of liability for BNT's debts which were really his debts incurred by Poffe on his behalf as owner of BNT. Under such circumstances, petitioner may have not suffered anywhere near the amount of the loss he claims. See Parkford v. Commissioner,133 F.2d 249, 251 (9th Cir. 1943), affg. 45 B.T.A. 461, 472 (1941). The long and the short of the matter is that we cannot begin to approximate petitioners' losses for they have presented what we consider no reasonable basis upon which we can base such an estimate. Coloman v. Commissioner,540 F.2d 427 (9th Cir. 1976), affg. a Memorandum Opinion of this Court. That petitioners encountered what they apparently considered insurmountable difficulties in obtaining and presenting sufficient *177 probative evidence does not relieve them of their burden of proof. Burnet v. Houston,283 U.S. 223, 228 (1931); Interlochen Co. v. Commissioner,232 F.2d 873, 879 (4th Cir. 1956), affg. 24 T.C. 1000 (1955). Accordingly, we find that petitioners have failed to carry their burden of proof and are not entitled to a deduction for a business loss under section 165. [5]
The next issue is whether petitioners are entitled to deductions under section 165(c)(3) for losses of property arising from theft. Petitioners contend that they suffered losses in 1981 arising from theft with respect to the $67,500 in funds petitioner invested with respect to the Medac II and Equipment transactions he entered into with Gordon. Respondent argues that not only were petitioners' purported losses with respect to these transactions not the result of thefts as contemplated under section 165(c)(3), but that, in 1981, petitioners still had a reasonable *178 prospect of recovering these funds and thus are not entitled to their claimed deductions. For the reasons discussed herein, we agree with respondent. Section 165(e) provides that "any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." Moreover, "Whether or not the activity constitutes a theft is determined by the law of the State where the loss was sustained." Paine v. Commissioner,63 T.C. 736, 740 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975). Because we believe that as of the end of 1981 petitioners had a reasonable prospect of recovery, we have no need to address the question whether the loss was from a theft (a matter as to which we believe there is considerable doubt on the record before us). Section 1.165-1(d)(3), Income Tax Regs., provides, in pertinent part, that if in the year of discovery there exists a claim for reimbursement with *179 respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received. It is well settled that "[a] reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor." Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795, 811 (1974), affd. 521 F.2d 786 (4th Cir. 1975). Such a determination must be based on "an objective inquiry requiring an examination of the facts and circumstances surrounding the deduction." Dawn v. Commissioner,675 F.2d 1077, 1078 (9th Cir. 1982), affg. a Memorandum Opinion of this Court. See also Boehm v. Commissioner,326 U.S. 287, 292-293 (1945); Ramsay Scarlett & Co. v. Commissioner,supra at 811-812. Accordingly, although a taxpayer's "attitude and conduct are not to be ignored" in *180 making this determination, Boehm v. Commissioner,supra at 293, they are not to be the "controlling or sole criterion," for the ultimate question to be decided is whether a loss has "been sustained in fact during the taxable year." 326 U.S. at 292. (Emphasis supplied in the original.) See also Ramsay Scarlett & Co. v. Commissioner,supra at 812. In retrospect, based on the events that actually transpired, petitioners do not now argue that bona fide claims for reimbursement against Gordon, Telcoa and SNB (and/or NS&T) did not exist in 1981. To the contrary, petitioners have demonstrated that, even aside from Gordon's questionable and apparently fraudulent dealings with petitioner, petitioner had actionable claims against SNB (and/or NS&T) and Telcoa under various sections of the Uniform Commercial Code of the District of Columbia. [6] However, petitioners assert they are still entitled to their claimed deductions because they believed no reasonable prospect of recovery existed at the end of the 1981 taxable year based upon their assertions that (1) certain information was not yet apparent or made available to petitioner *181 upon which he could base such claims, and (2) petitioner's lawyer O'Connell, while stating his suspicions that the aforementioned parties were liable to petitioner, advised him that an investigation and any subsequent litigation to develop these claims might be prolonged and expensive, and possibly fruitless. Although we do not question the sincerity of petitioners' beliefs, in light of the facts and circumstances as they existed in 1981, we conclude that petitioners have not shown that a reasonable prospect of recovery did not exist during that taxable year. To begin with, we do not interpret O'Connell's conclusions as suggesting that no reasonable prospect *182 of recovery existed in 1981. Although O'Connell cautioned petitioner as to the risks associated with pursuing his claims, he made clear that he felt potential liability did exist. Moreover, in view of the fact that O'Connell had undertaken what we consider to be only a preliminary investigation, we think the information that had already been unearthed by both him and petitioner, when coupled with O'Connell's suspicions, warranted petitioner further to pursue the matter, especially in light of the large amounts he was seeking to recover. While it was surely petitioner's right not to expend additional monies in furtherance of investigating the bona fides of his claims, such inaction does not entitle petitioners to a deduction under section 165. Furthermore, we note that petitioners, in essence, urge that we adopt a standard under which, in effect, taxpayers who are told by their attorneys that claims against others will probably be unsuccessful, will be allowed to take a loss deduction, on the basis of such advice alone, in the year in which such advice is given. For a taxpayer in such a situation, according to petitioners, is acting under a reasonable subjective belief that *183 his property has been irretrievably lost. [Ramsay Scarlett & Co. v. Commissioner,61 T.C. at 812.] However, as we discussed supra at pp. 20-21, the proper standard to apply is an objective one, and accordingly petitioners reliance on O'Connell's conclusions as sustaining their contention that no reasonable prospect of recovery existed, is misplaced. Ramsay Scarlett & Co. v. Commissioner,supra at 812. See also Huey v. Commissioner,T.C. Memo. 1985-348. Similarly, the fact that petitioners suggest that petitioner was unaware until after 1981 of certain facts that he contends were necessary for the successful pursuit of his claims, e.g., that Gordon had endorsed and deposited the Medac II check some 7 weeks prior to even the opening of the Medac II account or that Telcoa had received a $24,000 partial payment for the Equipment, does not tilt the scales in petitioners' favor. Under an objective standard, the test is whether given the facts as they occurred in 1981 did petitioner have a reasonable prospect of recovery under local law at the end of that taxable year, not whether petitioner had as yet collected enough *184 information to prosecute a successful legal action. Moreover, as we have previously indicated, see pp. 22-23, supra, even if petitioner was unaware of certain facts relevant to his claims for recovery, we think he had been presented with enough information by the close of the taxble year to arouse sufficient suspicion on his part that, at the very least, he continue the investigation. Furthermore, we think it significant that when petitioners filed their return on June 15, 1982 (petitioners had sought and received a 2-month extension to file) in which they claimed their deduction, petitioner was already aware of the alleged impropriety of the endorsement, had spoken to Sandground and had hired Leyton and the two investigators. We do not think it inappropriate to take this knowledge into account in determining whether petitioners had a reasonable prospect of recovery at the end of 1981, at least where the date on which the return for that year was filed and on which the loss deduction was claimed is not that long after the end of the year. See Rainbow Inn, Inc. v. Commissioner,433 F.2d 640, 644 (3d Cir. 1970), revg. on other grounds a Memorandum Opinion of *185 this Court. In view of the foregoing, we find that petitioners have not proved that they did not have a reasonable prospect of recovering their losses during the 1981 taxable year, and are therefore not entitled to a theft loss deduction under section 165. [7]
To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Petitioner testified that "the business has [sic] been proffered over to [Poffe] for the purpose of allowing her to be able to raise the loans free of the difficulty that would arise for a person doing business in California and the principle [sic] being in Virginia. But, we had the understanding that I will be employer and she was the employee."↩
2. With respect to petitioner's suit against NS&T, petitioner testified that "NS&T Bank was absolved by the U.S. District Court on the grounds that they relied on the warranty of the Security National Bank and honored the check of $20,000."↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Rules of Practice and Procedure of this Court.↩
4. Petitioner testified that "I'm at a distance and I want to salvage and not lose everything, therefore that was the next matter of business expediency that I said to her, 'Look, you use this money for business or profit for me so that if things -- if liabilities come on I, being at a distance, should not be liable for any acts of non-payment or torts of whatever."↩
5. Similarly, we find that petitioners have failed to prove that the Fiat automobile transferred to Poffe was used in BNT's business, and thus are not entitled to a business loss deduction with respect thereto.↩
6. See, e.g., D.C. Code Ann. sections 28:2-403, 28:4-207 and 28:9-307 (1981). Based upon our review of these and other relevant sections, as well as the evidence we have seen and heard, we are satisfied that, as of the end of 1981, petitioners had actionable claims and a reasonable prospect of recovery against the aforementioned parties. However, we see no need to offer a detailed opinion as to the merits of these claims. See Parmelee Transportation Co. v. United States,351 F.2d 619, 628↩ (Ct. Cl. 1965).
7. Our reasoning would be equally applicable had petitioners claimed a loss under the other provisions of section 165. See pp. 16-17, supra.↩