T.C. Memo. 1998-250

UNITED STATES TAX COURT

CHARLES F. SUTTER AND CHERYL SUTTER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10357-96.                    Filed July 8, 1998.

<u>Laura Lee Anderson</u>, for petitioners.

<u>Michael W. Lloyd</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CARLUZZO, <u>Special Trial Judge</u>:  This case was heard pursuant
to the provisions of section 7443A(b)(3) and Rules 180, 181, and
182.  Section references are to the Internal Revenue Code in
effect for the years 1991 and 1992.  Rule references are to the
Tax Court Rules of Practice and Procedure.

Respondent determined a deficiency in petitioners' 1991 and
1992 Federal income taxes in the amounts of $1,080 and $1,387,

respectively. The issue for decision is whether petitioners realized and must recognize income upon obtaining coverage under certain life insurance policies during the years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners are husband and wife. They filed timely joint Federal income tax returns for the years 1991 and 1992. At the time the petition was filed, they resided in Afton, Wyoming.

Charles Sutter was employed as a police officer by the City of Santa Monica, California, from 1963 until 1969. He was next employed as a police officer by the City of Afton, Wyoming, from 1969 until 1981. After leaving the Afton police force in 1981, he began to work for Valley Lumber, a sawmill and lumber company that was owned by Arthur Schwab.

Arthur Schwab is the father of Marvin Schwab. Marvin Schwab is the father of Daniel Schwab, Vance Schwab, and Lee Schwab. Charles Sutter first met the Schwabs in 1969 or 1970, when he was purchasing building materials to remodel his house. During the relevant periods, Marvin Schwab, Vance Schwab, and Daniel Schwab were licensed life insurance salesmen in the State of Wyoming. They were associated with the Daniel Schwab Agency, which was located in Afton, Wyoming. Although Lee Schwab maintained an office in the same building where the offices of the Daniel

Schwab Agency were located, he was not directly involved with that agency.

Charles Sutter purchased life insurance through Marvin Schwab before the years in issue. Although the extent of the coverage is not exactly clear from the record, it appears that before 1991, he generally maintained between $25,000 and $50,000 of life insurance. In 1991, Marvin Schwab approached Charles Sutter and suggested that he purchase a certain type of life insurance policy offered by the Royal Maccabees Life Insurance Co. (the Royal policy). At the time, Charles Sutter was employed by Aviat, Inc., and Christen Industries, Inc. His wages totaled $16,803.54 for that year.

The Royal policy was described as a flexible premium adjustable life insurance policy providing death benefits in the amount of $250,000. The first-year premium for the Royal policy was $7,177. On direct examination petitioner testified as follows with respect to the payment of the first-year premium due on the Royal policy:

> Q. Do you recall how he - - how you would pay for the policy?
>
> A. Yes.
>
> Q. How was that?
>
> A. He [Marvin Schwab] said he would give me the premium, and I would write back to * * * [Royal Maccabees Life Insurance Co.].

Marvin Schwab "gave" Charles Sutter the premium by arranging what was described as "nonrecourse premium financing" through Stable Reserve, Inc. (Stable), a Utah corporation. Marvin Schwab, Daniel Schwab, and Devon Nish owned and controlled Stable. Charles Sutter received a check from Stable, payable to him in the amount of the first-year premium. The check was drawn on Stable's account, signed by Marvin Schwab. In turn, a check in the same amount was drawn on petitioners' personal checking account, payable to the Royal Maccabees Life Insurance Co. (Royal). As part of the transaction, Charles Sutter signed a "Promissory Note (Interest)" to Stable in the amount of the first-year premium, payable with interest, but, at the option of the maker, only from the death benefit proceeds of the Royal policy. He was not required to, and did not, submit a financial statement to Stable before receiving the funds from Stable.

In addition to the note, Charles Sutter signed an assignment of the Royal policy in favor of Stable, but the assignment document was never forwarded to Royal. Royal allowed such life insurance policies to be assigned only with its consent. Royal was not aware of, and did not consent to, the above-referenced assignment.

Stable offered the type of service provided to Charles Sutter only to clients or customers of the Daniel Schwab Agency.

In similar transactions, Stable has never been repaid or demanded repayment from the makers of the notes.

Charles Sutter allowed the Royal policy to lapse, as was his option. From the outset, he never intended to maintain the original coverage that the Royal policy provided. He never paid any other premiums on the policy, nor did he ever make any payments on the note. No demand for payment was ever made by Stable.

As the selling agent, Marvin Schwab was entitled to a commission from Royal equal to 117 percent of the first-year premium on the Royal policy. Consistent with its practice, Royal paid the commission to Marvin Schwab within days after the Royal policy was purchased.

During the relevant period and under similar circumstances, the Daniel Schwab Agency sold 120 life insurance policies similar to the Royal policy. The Schwabs were paid substantial commissions by Royal upon the sales of the Royal policy and the similar policies. Upon learning about the similar transactions, officials from the Wyoming Insurance Department interviewed Daniel Schwab. During the interview Daniel Schwab represented that notes similar to the one described above were necessary in the event that the Internal Revenue Service questioned the Federal income tax consequences of the transactions.

The fair market value of the insurance coverage that Charles Sutter received pursuant to the Royal policy was equal to the first-year premium.

Knowing that the Royal policy would lapse, one of the Schwabs recommended that Charles Sutter purchase another life insurance policy in 1992. This time the policy involved was offered by the Columbus Life Insurance Co. (Columbus). During 1992, Charles Sutter was employed by Aviat, Inc., and Dory Logging, Inc. His wages for that year totaled $20,410.43. Upon the recommendation of one of the Schwabs, Charles Sutter purchased a universal life insurance policy from Columbus that provided death benefits in the amount of $270,000. The first-year premium on this policy was $6,705.60. The sale of this policy was an even better deal for the Schwabs than the sale of the policies described above that were offered by Royal. Columbus paid the selling agent a commission (including bonus and other incentives) in excess of 190 percent of the first-year premium on this type of life insurance policy. Consequently, Vance Schwab, who was listed as the selling agent on the Columbus policy, was paid a commission of $12,791.48 by Columbus on the sale of the Columbus policy to Charles Sutter in 1992.

In 1992 the Schwabs sold a life insurance policy to Cheryl Sutter as well. At the time she was employed as a cook for the local school district and by Marc Barrus. Her wages for that

year totaled $10,449.48. Through the Schwabs, she also purchased a Columbus life insurance policy. Her policy provided death benefits in the amount of $125,000. The first-year premium for her policy was $2,535. For selling the policy to her, Vance Schwab received a commission of $4,538.54 from Columbus.

Petitioners were offered "premium financing" arrangements through the Schwabs in connection with the life insurance policies they obtained from Columbus in 1992. In this regard Cheryl Sutter was given a check in the amount of the first-year premium, drawn on an account of Rocky Mountain Revenue (RMR), a corporation controlled by Lee Schwab. In turn, she issued a check in the same amount from petitioners' personal checking account payable to Columbus. She signed a "Promisary [sic] Note (Interest)" payable to RMR. Except for the date, maker, holder, amount, and insurance company involved, the note Cheryl Sutter signed in connection with her Columbus policy is substantially identical to the note Charles Sutter signed in connection with the Royal policy. Cheryl Sutter allowed her Columbus policy to lapse after the initial period of coverage, as was her option. She never paid any other premium on the policy. She made no repayments on the note, and repayment was never demanded by RMR.

In connection with his Columbus policy, Charles Sutter received a check from one of the Schwabs in the amount of the first-year premium drawn on an account of Double Diamond

Investors (DDI). In turn, a check in the same amount was issued from petitioners' personal checking account (signed by Cheryl Sutter), payable to Columbus. Charles Sutter signed a "Promisary [sic] Note (Interest)" payable to DDI. Except for the date, maker, holder, and amount, the note he signed in connection with his Columbus policy is substantially identical to the note signed by his wife in connection with her Columbus policy. Charles Sutter allowed his Columbus policy to lapse after the initial period of coverage, as was his option. He never paid any other premium on the policy. Shortly after being executed, the note to DDI was repaid by SBTA, a Wyoming corporation controlled by Daniel Schwab and Vance Schwab. Charles Sutter never signed a note payable to SBTA, or made any payments to SBTA, in connection with this transaction.

DDI is an unincorporated business owned and controlled by Evan and Marie Walton. Through DDI, the Waltons provided funds to customers or clients of the Daniel Schwab Agency under circumstances similar to those described above. The Waltons dealt directly with one of the Schwabs and not with either petitioner, or similarly situated individuals. In this case, and in numerous similar transactions, the Waltons were repaid by SBTA, as expected and in accordance with their arrangements with the Schwabs.

As in the case of the Royal policy, the Columbus life insurance policies were assigned to either RMR or DDI, as appropriate, but the assignment documents were never forwarded to Columbus. The fair market values of the insurance coverage that petitioners received from the Columbus policies in 1992 equaled the amount of the first-year premiums on the policies.

OPINION

Transactions similar to the ones described above were first considered by this Court in Wentz v. Commissioner, 105 T.C. 1 (1995), and by other Federal courts in Woodbury v. United States, 72 AFTR 2d 93-6140, 93-2 USTC par. 50,528 (D.N.D. 1993), affd. per curiam without published opinion 27 F.3d 572 (8th Cir. 1994). In those cases the taxpayers argued: (1) The transactions did not result in taxable income, but rather only reduced the cost of the life insurance through rebates (this argument was rejected in those cases and was not advanced by petitioners in this case); and (2) to the extent that the transactions did result in taxable income, the measure of income should be the fair market value of term life insurance that would have provided the same death benefit. The Commissioner argued that the fair market value should be measured by the first-year premiums paid for the type of life insurance involved. In those cases, the courts agreed with the Commissioner.

For their participation in the transaction, in the Wentz case, 105 T.C. at 11-12, we stated: "[The taxpayers] were compensated with the annual benefits of whole life insurance policies, thus triggering a taxable event." Relying in part on Woodbury, we found that the "undeniable accession to wealth, clearly realized", Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955), that the Wentzes enjoyed equaled the amount of first-year premium. Unlike petitioners, however, the taxpayers in Wentz and Woodbury did not execute notes in connection with the transactions under consideration in those cases.

In this case petitioners concede on brief that if income has been realized as a result of the transactions here under consideration, the proper measure of the income equals the first-year premium paid in connection with each policy. Petitioners argue, however, that the transactions did not result in the realization of income because they "paid" for the insurance with nonrecourse notes. According to petitioners, the notes, which they contend represent bona fide indebtedness, distinguish their case from Wentz v. Commissioner, supra, and Woodbury v. United States, supra. Respondent argues that the notes do not represent bona fide indebtedness and should therefore be ignored.

Respondent finds support for his argument in Haderlie v. Commissioner, T.C. Memo. 1997-525. Like petitioners, the Haderlies were clients of the Schwabs and were induced by them to

purchase a life insurance policy from Royal under circumstances more or less identical to those involved in this case. In that case we described Stable as the Schwabs' "straw entity" and referred to the taxpayers' note to Stable as "illusory". We found that the taxpayers were enriched to the extent that they received the benefit of a year's worth of life insurance coverage at no cost, and relying upon Wentz v. Commissioner, supra, and Woodbury v. United States, supra, held that they realized taxable income to the extent of the first-year premium attributable to the life insurance policy there involved.

Although the parties disagree on various points in this case, the critical dispute between them focuses upon the bona fides of the indebtedness represented by the notes signed by petitioners. Petitioners claim that the notes were in all respects valid, although they concede that the underlying debts represented by the notes became uncollectible when the related insurance policies lapsed. Respondent, relying upon Haderlie v. Commissioner, supra, argues that the notes were illusory. According to respondent, there was no valid indebtedness between the holders and either petitioner.

We agree with respondent, particularly with respect to the DDI note. At the time that the DDI note was executed Charles Sutter had no intention to repay the indebtedness it represented, and the Waltons had no intention to collect from Charles Sutter.

Consequently, for Federal income tax purposes there was no debt between the Waltons and Charles Sutter. See Beaver v. Commissioner, 55 T.C. 85 (1970). Pursuant to the apparent arrangement among Charles Sutter, the Waltons, and the Schwabs, the DDI note was to be repaid not by Charles Sutter, but by the Schwabs, or an entity controlled by the Schwabs. This is in fact what happened not only in this case, but with other customers of the Schwabs as well who received funds from DDI. As far as Charles Sutter was concerned, the DDI note was a nullity. Disregarding the DDI note, it follows from our holding in Wentz v. Commissioner, supra, see also Haderlie v. Commissioner, supra, that the fair market value of the life insurance coverage Charles Sutter received from Columbus, measured by the amount of the first-year premium for that insurance, must be included in petitioners' income for 1992, and we so hold.

Respondent's argument that the Stable and RMR notes were also illusory is likewise persuasive. There is credible evidence in the record that those notes were afterthoughts, designed not to represent legitimate debt between the makers and holders, but to disguise transactions that would otherwise lead to the Federal income tax consequences that are involved in this proceeding. The manner in which the Schwabs orchestrated each transaction through entities that they controlled, coupled with the extent of the compensation they received from the insurance companies,

supports respondent's contention in this regard. Except for the insurance companies, all parties to the transactions profited; the Schwabs received commissions in excess of the amounts dispersed through their controlled entities; petitioners received life insurance coverage at no cost for a limited period. No one seemed particularly concerned about whether the debts would be satisfied. Under the circumstances, the legitimacy of the debt evidenced by each note has not been established.

Our conclusion in this regard is bolstered by the following: (1) At the option of the makers, the notes were payable only from the death benefit proceeds of the life insurance policies, a contingency that made collectibility uncertain, at best; (2) there was never an intent by the makers to continue full coverage under the life insurance policies beyond the initial periods, rendering the notes uncollectible after those periods; and (3) the holders never took the necessary steps to validate the assignments in order to protect the collateral, actions that we expect would routinely be taken by legitimate creditors.

Consequently, we find that the insurance coverage that Charles Sutter received under the Royal policy in 1991 and the insurance coverage that Cheryl Sutter received under the Columbus policy in 1992 were obtained in return for notes that did not represent bona fide indebtedness. It follows that petitioners realized and must recognize income during those years to the

extent of the fair market value of the insurance coverage provided by those policies, measured by the amount of the first-year premiums.  Respondent's determination in this regard is therefore sustained.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.