T.C. Memo. 2010-115


UNITED STATES TAX COURT


MARK CURCIO AND BARBARA CURCIO, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.  1768-07,  1769-07,    Filed May 27, 2010.
             14822-07, 14917-07.


Ira B. Stechel and John T. Morin, for petitioners.

Brian E. Derdowski, Jr., Peter James Gavagan, and Brian J.

Bilheimer, for respondent.


_____

[1]Cases of the following petitioners are consolidated
herewith:  Ronald D. Jelling and Lorie A. Jelling, docket No.
1769-07; Samuel H. Smith, Jr., and Amy L. Smith, docket No.
14822-07; Stephen Mogelefsky and Roberta Mogelefsky, docket No.
14917-07.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  The docketed cases, consolidated for the purposes of trial, briefing, and opinion, consist of three groups of test cases selected to resolve a number of disputes regarding companies participating in the Benistar 419 Plan & Trust (the participating companies).  The groups are:  (1) Mark Curcio and Ronald Jelling, as the equal owners of several car dealerships in the Paramus, New Jersey, area, and their wives, Barbara Curcio and Lorie Jelling; (2) Samuel Smith, as the owner of S.H. Smith Construction, Inc., and his wife, Amy Smith; and (3) Stephen Mogelefsky, as the owner of Discount Funding Associates, Inc., and his wife, Roberta Mogelefsky.  In these consolidated cases, respondent determined deficiencies and penalties with respect to petitioners' Federal income taxes as follows:

Mark Curcio and Barbara Curcio (Docket No. 1768-07)

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------------|
| 2001 | $79,946 | $15,989 |
| 2002 | 81,568 | 16,314 |
| 2003 | 72,098 | 14,420 |
| 2004 | 63,519 | 12,704 |

Ronald D. Jelling and Lorie A. Jelling (Docket No. 1769-07)

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------------|
| 2001 | $79,946 | $15,989 |
| 2002 | 81,568 | 16,314 |
| 2003 | 71,018 | 14,204 |
| 2004 | 72,100 | 14,420 |

Samuel H. Smith, Jr. and Amy L. Smith (Docket No. 14822-07)

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------------|
| 2003 | $64,157 | $12,831.40 |

Stephen and Roberta Mogelefsky (Docket No. 14917-07)

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------------|
| 2003 | $271,204 | $54,240.80 |

The deficiencies are based on respondent's determination that the contributions by the participating companies to the Benistar 419 Plan & Trust are not currently deductible by the companies as ordinary and necessary business expenses under section 162(a) or are currently includable by petitioners as a corporate distribution. Respondent accordingly either increased the net amount of passthrough income that petitioners received from the participating companies or directly increased petitioners' income.

The issues for decision are, first, whether payments to the Benistar 419 Plan & Trust for employee benefits are ordinary and necessary business expenses under section 162(a), and if so, whether the payments are deductible contributions to a multiple-employer welfare benefit plan under section 419A(f)(6), and, second, whether petitioners are liable for accuracy-related penalties under section 6662.

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. The parties have stipulated that the proper venue for an appeal of this decision is the Court of Appeals for the Second Circuit. See sec. 7482(b)(2). The relevant facts largely concern petitioners' involvement with the Benistar 419 Plan & Trust.

<u>Benistar Plan</u>

<u>Background</u>

The Benistar 419 Plan & Trust was established in December 1997, and was crafted by Daniel Carpenter to be a multiple-employer welfare benefit trust under section 419A(f)(6) providing preretirement life insurance to covered employees. Carpenter is a lawyer with experience in tax and employee benefits law. In addition to designing the plan, he also drafted or approved all of its subsequent amendments. The trust was not intended to be, and has never been, a tax-exempt trust under section 501.

The Benistar Plan & Trust was originally based on A Professional's Guide to 419 Plans, a 1997 book by Carpenter. Carpenter wrote the book in response to many financial advisers'

impression that Carpenter's section 419 plans were too good to be true. In the book, Carpenter discusses the provisions of section 419.

The Benistar 419 Plan & Trust was first sponsored by Benistar Employer Services Trust Corp., and then, beginning in 2002, by Benistar 419 Plan Services, Inc. (both Benistar Plan Sponsor). Carpenter is the chairman and chief executive officer of Benistar 419 Plan Services. Benistar 419 Plan Services contracts with Benistar Admin Services, Inc., to administer the trust. We refer to the trust, sponsor, and administrator collectively as Benistar Plan.

Benistar Plan provides preretirement life insurance to select employees of companies enrolled in the plan. The enrolled companies contribute money to a trust account that funds the benefits, and Benistar Plan issues a certificate of coverage to the employer with the amount of the death benefit payable by the plan. Benistar Plan uses enrolled companies' contributions to acquire one or more life insurance policies covering the employees insured by the plan, and it withdraws from the trust account as necessary to pay the premiums on those policies. We refer to these insurance policies as the underlying insurance policies, because they underlie each policy issued by Benistar Plan and, as a result, Benistar Plan is fully reinsured. Enrolled companies can choose the number of years that

contributions to Benistar Plan will be required in order to fully pay for the death benefit or benefits.

Under the plan and trust documents, the Benistar Plan trust may pay reasonable expenses incurred in the establishment or administration of the plan, including attorney's and accountant's fees.  In 2006, Benistar Plan withdrew 9 percent of the net surrender value of the insurance policies as of December 31, 2005, to cover the expenses of the trust in responding to inquiries from and audits by the Internal Revenue Service (IRS).

At all times during the relevant years at least 10 different business entities participated in Benistar Plan.

Amendments

Since Benistar Plan's inception in December 1997, the plan and trust documents outlining the plan terms have been amended at least five times.  The plan operates as though each amendment to the plan documents is retroactive to December 1997, but only for current participants.  Amendments to the plan documents made after a former participant has left the plan are not applied retroactively to that participant.

The first amendment was before 2002, and it made largely cosmetic changes.  In the second amendment, dated January 2, 2002, Benistar Plan changed plan sponsors from Benistar Employer Services Trust Corp. to Benistar 419 Plan Services, Inc., switched trustees from First Union to J.P. Morgan, and merged

most of its original trust agreement into a plan and trust agreement. It also changed the agreement at section 5.01 by inserting the additional clause that "In no event will the Plan be liable for any death benefit if the Insurer shall, for any reason, fail to pay such insurance proceeds on the life of the Covered Employee."

Two separate amendments were both dated January 1, 2003. The first 2003 amendment was made in response to section 1.419A(f)(6)-1, Proposed Income Tax Regs., 67 Fed. Reg. 45938 (July 11, 2002). In an attempt to avoid an experience rating under the proposed regulations, the agreement required that insurance rates under Benistar Plan be those determined in section 1.79-3(d)(2), Income Tax Regs., using the methodology described under section 7702. The amended agreement stated that the plan sponsor would apply those provisions "to determine the benefit cost for all Employers, which shall be determined without regard to the Plan's cost to acquire individual policies of reinsurance on the lives of Covered Employees." Benistar Plan also removed a provision that required the plan sponsor to distribute the underlying insurance policies to the covered employees of an enrolled employer when that employer leaves Benistar Plan. The second 2003 amendment, although dated January 1, 2003, was made sometime in late 2003 or early 2004 and removed the clause inserted in 2002 exculpating the plan from paying

death benefits if an underlying insurer fails to pay the death benefit.

The final amendment was dated January 2, 2004. The changes made by this amendment included expanding the scope of the arbitration clause governing the resolution of disputes between Benistar Plan and its participants.

Enrollment

To enroll employers, Benistar Plan does not directly target employers or employees, but rather relies on insurance brokers. To educate insurance brokers, Benistar Plan conducts numerous seminars.

When enrolling, prospective employers or their employees, with the aid of their insurance brokers, select life insurance policies from a number of major life insurance companies. Employees exercise a large degree of control over their underlying insurance policy. In addition to selecting the carrier, prospective employers or their employees may select the benefit amount, the premium payments, and the type of insurance-- term, whole, universal, or variable.

Term life insurance covers the insured only for a particular period, and upon expiration of that period, terminates without value. Whole life insurance covers an insured for life, during which the insured pays fixed premiums, accumulates savings from an invested portion of the premiums, and receives a guaranteed benefit upon death, to be paid to a named beneficiary. Universal

life insurance is term life insurance in which the premiums are paid from the insured's earnings from a money-market fund. Variable life insurance is life insurance in which the premiums are invested in securities and whose death benefits thus depend on the securities' performance, though there is a minimum guaranteed death benefit. Because whole life insurance, universal life insurance, and variable life insurance include a savings component in addition to the their insurance component, they almost always have higher premiums than term life insurance, and they accumulate value that may be removed from the policy either via a loan from the insurance company secured by the policy or a cash withdrawal that reduces the savings component of the policy. However, as the owner of the underlying policies, Benistar Plan does not permit employers or covered employees to withdraw money from their underlying policies through either loans or cash withdrawals.

Benistar Plan places three restrictions on the underlying insurance policies that it will purchase. First, prospective participants may request policies only from life insurance companies that are licensed by the State of New York, which Carpenter perceives as more reliable. Second, Benistar Plan requires that any dividend paid out by the policy be reinvested in the policy as a paid-up addition. Paid-up additions increase the death benefit of the underlying policy, although they do not affect the death benefit promised by Benistar Plan to the insured

employee.  Third, prospective participants selecting a variable universal life insurance policy must allocate the investment portion of the policy to either the insurance guaranteed fund or the Standard & Poor's (S&P) 500 equity index.  The purpose of this restriction is to ensure that participants do not use the underlying insurance policy as a means of accumulating assets within Benistar Plan through diversified or more risky investments.  Benistar Plan's policy was not to allow covered employees to change their allocation once selected and to terminate covered employees that use the plan to accumulate assets.

In addition to selecting the policy that would underlie the death benefits promised by the plan, prospective participants, with their insurance agents, have to complete a number of documents, including agreement and acknowledgment forms and a certificate of corporate resolution authorizing the company to enroll in the plan.  One of the forms, a disclosure and acknowledgment form, states that

> The undersigned Employer, on its own behalf, and on behalf of its Participating Employees, hereby acknowledges the following:
>
> 1.  In determining whether to adopt the Plan and to what extent they would participate, they have sought and relied on legal and tax advice from their own independent advisors;
> 2.  The Employer and Participating Employees are responsible for the tax consequences resulting from adoption and/or participation in the Plan;
> 3.  * * * The Plan Sponsor, Administrator, Trustee and Carrier cannot and have not guaranteed or promised

any particular legal or tax consequences from the Employer's adoption or participation in the Plan;

\* \* \* \* \* \* \*

7. The plan provides for death benefits for Participating Employees and cannot be used as a vehicle for deferred compensation or retirement income.

The disclosure and acknowledgment forms signed by petitioners vary slightly in wording, but not materially.

Once the employers or their employees fill out the paperwork, the completed life insurance applications are sent to Benistar Plan. Benistar Plan checks the policy applications to ensure that Benistar Plan Sponsor is the owner and that the Benistar 419 Plan & Trust is the beneficiary. Other than those two fields, Benistar Plan does not modify the applications. Once the insurance policies are approved by the insurance companies, employers are sent an "admin packet", which consists of copies of the signed agreement and acknowledgment forms originally submitted with the application; certificates of coverage for the covered employees; a copy of the corporate resolution; papers detailing the benefits of enrollment; a summary plan description; and an opinion letter from Edwards & Angell, LLP, an independent law firm, claiming that the plan qualifies for the advertised tax consequences. The benefits of enrollment listed in the admin packet include:

- Virtually Unlimited Deductions for the Employer;
- Contributions can vary from year to year;

- Benefits can be provided to one or more key Executives on a selective basis;
- No need to provide benefits to rank and file employees;
- Contributions to the BENISTAR 419 Plan are not limited by qualified plan rules and will not interfere with pension, profit-sharing or 401(k) plans;
- Funds inside the BENISTAR 419 Plan accumulate tax-free;
- Death proceeds can be received both income and estate tax-free by beneficiaries;
- Program can be arranged for tax-free distribution at a later date;
- Funds in the BENISTAR 419 Plan are secure from the hands of creditors.

By the end of 2003, in an effort to comply with section 1.419A(f)(6)-1, Income Tax Regs., Carpenter updated this list to forbid distributions of Benistar Plan's underlying insurance policies.

There were a number of Edwards & Angell opinions issued to Benistar Plan. The firm issued Benistar Plan opinion letters in December 1998, November 2001, and October 2003. In addition, Edwards & Angell issued Benistar Plan a letter in December 2003 stating that Benistar Plan is not a tax shelter as described in section 6111, or a potentially abusive tax shelter or listed transaction as described in section 301.6112-1(b)(2), Proced. & Admin. Regs.

Contributions

Once the employer is properly enrolled, it makes contributions to Benistar Plan in accordance with notices sent by the plan. The notices, addressed to the employer, list the

underlying insurance policy owned by Benistar Plan and the amounts due to keep the particular underlying policy active.  If an employer is more than 30 days late in making contributions, the employer may be terminated from the plan.

In addition, the notices of contribution state that "you may contribute additional amounts to the Benistar 419 Plan. If you choose to do so please contact your broker: [broker's name]." If additional amounts are contributed to Benistar Plan, those amounts remain in the trust account and are not used to make additional payments on the underlying insurance policy.  Benistar Plan keeps track of the contribution on internal spreadsheets, and assuming the plan has enough assets to cover current liabilities, the contribution is used only for the policy to which it is allocated.  All contributions are deposited in one trust account, and those amounts, plus the values of the policies owned by Benistar Plan, are available to satisfy any claim on the trust.  In addition, as mentioned earlier, the trust may pay reasonable expenses incurred in the establishment and administration of the plan, including attorney's fees and accountant's fees.

Originally, the enrolled employer and its insurance agent would determine the amount of any additional contributions to make to Benistar Plan.  Starting in 2000, Benistar Plan required that the contributions be sufficient to fully fund the underlying insurance policy in a maximum of five annual contributions.

In 2002, Benistar Plan began to encourage new employers to fund their employees' participation in the plan through one large lump-sum contribution. In 2003, lump-sum funding became mandatory. The primary reason, according to Carpenter, was to make sure Benistar Plan was not experience rated, in violation of section 419A(f)(6). An additional reason listed in some Benistar Plan enrollment documents was "to insure against the lack of deductibility of future contributions to the plan, a potential downturn in the economy or any other unforeseen financial circumstance." To determine the total amount necessary to contribute, Benistar Plan developed the Benistar 419 Funding Calculator, which calculates the cost of life insurance by using the rate table in section 1.79-3(d)(2), Income Tax Regs. Benistar Plan would take the present value, discounted assuming a 6-percent annual interest rate, of each year's cost of life insurance from the age of the insured until 90--even though Benistar Plan provides only preretirement death benefits. This amount was charged regardless of the insured employee's gender or health.

<u>Termination</u>

Short of dying, there are three ways a covered employee may leave Benistar Plan. First, the employee may stop working for the enrolled employer. Second, the enrolled employer may choose to leave Benistar Plan or may be terminated involuntarily. Third, Benistar Plan may terminate or discontinue the plan.

If an employee stops working for an enrolled employer, according to the terms of the plan and trust agreement the employee has 30 days to purchase the underlying policy from Benistar Plan at a value determined by Benistar Plan Sponsor. If the employee does not purchase the policy, the trustee of Benistar Plan may surrender the policy to the insurance company and add the proceeds to the trust account. Originally the employer could also request that the policy be transferred to another welfare benefit trust, but that clause was removed in the first 2003 amendment to the plan and trust agreement.

Employers could terminate their participation in the plan at any time by sending a letter of termination on company letterhead to Benistar Plan and paying a $500 termination fee. Under the plan's original terms, if an enrolled employer left Benistar Plan voluntarily, the plan could, assuming the liabilities of the plan were currently met, distribute the underlying policies to the insured employees at no cost. These terms were changed by the first 2003 amendment to the plan and trust agreement. From mid-2002 to mid-2005, it was Benistar Plan's general practice to distribute the policies to the insured employees for the price per policy of 10 percent of the net surrender value of that policy. The net surrender value was calculated as of December 31 of the previous year, and premium payments that were made during the year of the distribution were not included. If the policy

had no net surrender value, Benistar Plan charged $1,000 for the distribution.

After mid-2005, Benistar Plan began to charge covered employees the fair market value of the underlying policy, as defined in Rev. Proc. 2005-25, 2005-1 C.B. 962. However, Benistar Plan does not receive the fair market value of the policy up front. It permits the insured employee to borrow the cost of the purchase, providing as collateral the insurance policy itself by signing a collateral assignment agreement. The collateral assignment agreement provides:

2. The [Benistar 419] Trust's interest in the Policy shall be limited to:

(a) The right to be repaid its cumulative loans plus interest paid or, if less, the net cash surrender value of the Policy, in the event the Policy is totally surrendered or cancelled by the Participant;

(b) The right to be repaid its cumulative loans plus outstanding interest, in the event of the death of the Insured;

(c) The right to be repaid its cumulative loans plus outstanding interest, or, if less, the net cash surrender value of the Policy, or to receive ownership of the Policy, in the event of termination of the Agreement;

(d) An amount not to exceed $300,000 if less than the amount listed above.

3. The Participant shall retain all incidents of ownership in the Policy, including, but not limited to, the sole and exclusive rights to: borrow against the Policy; make withdrawals from the Policy; assign ownership interest in the Policy; change the beneficiary of the Policy; exercise settlement options; and, surrender or cancel the Policy (in whole or in

part). All of these incidents of ownership shall be exercisable by the Participant unilaterally and without the consent of any other person.

As a surrogate for 3 years of interest, Benistar Plan charges the insured employee 10 percent of the net surrender value, which must be prepaid at the time the insured employee requests to withdraw the underlying policy.

An employer may also be terminated from Benistar Plan involuntarily if it fails to contribute the amount previously billed by the plan. In this case, Benistar Plan may surrender the policy to the insurance carrier and add the proceeds to the trust.

If Benistar Plan terminates, the underlying policy may be distributed to either the covered employee or to a trust for that employee's benefit at the discretion of Benistar Plan Sponsor.

Aside from termination, an enrolled employer or its covered employee may not withdraw contributions made to Benistar Plan. Benistar Plan allows potential enrolled employers who prepaid contributions to request a refund if they later decide not to participate in the plan, but this is viewed by the plan as an annulment of the transaction, rather than a forbidden distribution.

## Mark and Barbara Curcio and Ronald and Lorie Jelling

Petitioners Mark and Barbara Curcio and Ronald and Lorie Jelling resided in New Jersey at the time they filed their petitions. Mark Curcio (Curcio) has a bachelor's degree in

accounting.  Curcio was born in 1955, and Ronald Jelling (Jelling) was born in 1957.

Curcio and Jelling are business partners owning and operating car dealerships, and neither has any plans to retire. They have always split ownership of their car dealerships 50-50. Their first dealership was Chrysler of Paramus, founded about 1990.  About 1994, they founded Grand Dodge of Englewood, and in about 1995 they founded Dodge of Paramus.  In about 2002, they founded Westwood Chrysler Jeep, and they hold it through an entity treated as a partnership for tax purposes, JELMAC, LLC. Collectively, we refer to these equally owned entities as the car dealerships.

Dodge of Paramus enrolled in Benistar Plan in December 2001, and it elected to provide life insurance benefits through the Benistar Plan to Curcio and Jelling as employees.  It did not provide benefits through Benistar Plan to any of the other approximately 75 full-time employees.  None of the approximately 220 employees employed by the other car dealerships (other than Curcio and Jelling themselves) received benefits through Benistar Plan.

One of the purposes of enrolling in Benistar Plan was to fund a buy-sell purchase agreement between Curcio and Jelling. The buy-sell agreement stipulated that should one partner die, the other partner would buy, and the deceased partner's estate would sell, the deceased partner's stake in the car dealerships

for a previously agreed-upon value, which was set at $6 million. By naming each other as beneficiaries of the Benistar Plan policy, Curcio and Jelling ensured that each had sufficient liquidity to purchase the other's stake for the agreed-upon price. Although Dodge of Paramus enrolled in Benistar Plan in 2001, the buy-sell agreement was not executed until March 2003. Curcio and Jelling both believed that the buy-sell agreement and the Benistar enrollment occurred within about a year's time.

Before enrolling in Benistar Plan, Curcio and Jelling consulted Stuart Raskin, the accountant for Dodge of Paramus. Neither Raskin nor anyone in his firm is an expert, or appears to be an expert, in welfare benefit plans. Raskin reviewed the Edwards & Angell opinion letter and advised Curcio and Jelling that, solely on the basis of the opinion letter, Dodge of Paramus could claim deductions for contributions to Benistar Plan.

Consistent with the procedures for enrolling in Benistar Plan, Curcio and Jelling met with their respective insurance agents to select life insurance policies from third-party insurers to be purchased as investments by Benistar Plan. The policies they selected both carried death benefits of approximately $9 million, which would underlie a total death benefit payable by Benistar Plan of $9 million each even though, as of the 2003 version of the buy-sell agreement, the most Curcio or Jelling would be forced to pay for the other's interest was $6 million. Curcio and Jelling also contemplated having to make

contributions for 10 years, after which they would receive life insurance coverage but would no longer have to contribute.

Curcio's insurance agent was Robert Iandoli. Iandoli met Curcio around 1998, when he sold Curcio life insurance and some securities and assisted Curcio with basic investment and estate planning. Curcio was not particularly knowledgeable regarding life insurance and relied at the time on Iandoli's expert advice. Curcio and Iandoli selected an Ensemble III flexible premium variable life policy from Jefferson Pilot Financial. The policy paid a death benefit of $9 million. Curcio chose to have the accumulation value of the life insurance policy invested in the S&P 500 equity index.

Because of a certain health condition, Curcio's underlying insurance policy was rated, which means the premiums were more expensive. Iandoli estimated that $200,000 annually would be sufficient to cover the premium payments for the selected policy, and therefore elected to make $200,000 contributions annually to Benistar Plan.

In 2004, Iandoli, on his own initiative but with Curcio's knowledge, was successful in having the rating removed from the policy, thereby reducing the cost of the underlying insurance on Curcio; but Jefferson Pilot required that the death benefit be raised to $9.1 million. The underlying policy's annual premium and the death benefit from the Benistar Plan policy remained the same.

Jelling's insurance agent was Alan Solomon, whom he had known at the time for over 30 years. Jelling was not particularly knowledgeable about insurance and relied on Solomon's advice. Jelling and Solomon selected two life insurance policies from Security Mutual Life Insurance Co.--the first, a flexible premium whole life with adjusted amounts policy, and the second, a flexible premium universal life policy. The two policies were structured so that Jelling's contributions to Benistar Plan would be the same as Curcio's, $200,000 annually, and the death benefit would be $9 million. Solomon thought that the two policies would provide the optimum mixture of insurance for Jelling because "A whole life policy gives you very good values, gives you a contract that has stringent parameters, where a universal life is much more flexible," because with a universal life insurance policy the term component of the insurance comes from a savings account, and as long as the savings account has enough funds to cover the term premium, the coverage will not lapse. The policies carried a combined death benefit of $9,000,836.

Once the underlying life insurance policies were selected, Iandoli and Solomon filled out the necessary paperwork, leaving the beneficiary and owner fields blank. The forms were then sent to Benistar Plan to fill in the remaining information and forward to the insurance companies to apply for the policy.

Dodge of Paramus paid Benistar Plan a total of $400,000 in both 2001 and 2002. On its Forms 1120S, U.S. Income Tax Return for an S Corporation, Dodge of Paramus claimed a deduction for the $400,000 payment for both 2001 and 2002. In 2003, JELMAC paid Benistar Plan the $400,000 and claimed a deduction for the payment on its Form 1065, U.S. Return of Partnership Income. In 2004, Chrysler Plymouth of Paramus paid Benistar Plan the $400,000 and claimed a deduction for the payment on its Form 1120S.

On October 25, 2006, the IRS sent the Curcios and the Jellings notices of deficiency, determining deficiencies in their 2001-2004 Federal income taxes, as well as accuracy-related penalties under section 6662(a) for each of those years. The deficiencies stemmed from additional passthrough income split between the Curcios and the Jellings from the car dealerships as a result of the disallowance of the dealerships' deductions of contributions to Benistar Plan.

Samuel and Amy Smith

Petitioners Samuel and Amy Smith resided in Virginia at the time they filed their petition. Samuel Smith (Smith) was born in 1963.

In 1998, Smith started SH Smith Construction, Inc., after having run the painting division of his father's company for 4 years. On June 11, 2002, SH Smith Construction adopted a certificate of resolution electing to enroll in Benistar Plan.

At the time, SH Smith Construction had 35 to 40 employees, but it chose to insure only Smith's life through the plan.  Smith, with his financial adviser Richard Emery, selected a flexible-premium variable life insurance policy from ING Group with a death benefit of $5 million and annual premium payments of $54,000 to be purchased by Benistar Plan.  On the insurance application, Smith indicated that the purpose of the insurance was retirement planning.  The policy was sent to Benistar Plan, and upon approval from ING Group, Benistar Plan issued a certificate of coverage dated July 15, 2003, insuring Smith with a death benefit of $5 million.

SH Smith Construction deducted $177,966 on its Form 1120S for 2003 under "Employee benefit programs".  Of that sum, $750 was an administrative fee paid to Benistar Plan, and $54,000 was contributed to Benistar Plan.  Benistar Plan paid the premium on the ING Group policy when the policy was issued in late 2002 and paid premiums again in late 2003 and early 2005.  When the policy was issued, its accumulation value, as listed on the insurance policy statement, was invested in the Janus Aspen Balanced fund. Sometime between July and September 2003, the accumulation value of the policy was shifted from the Janus Aspen Balanced fund to the Alger American Leverage All Capital fund.  Between July and September 2005, the accumulation value of the policy was shifted from the Alger American Leverage All Capital fund and distributed among five other funds, referred to on the policy statement as

AIM VI Utilities, ING Inv. VanKmpn Real Estate, ING INV Evergreen Omega, ING INV MFS Utilities, and ING PRT AC Small Cap.

On September 27, 2005, SH Smith Construction notified Benistar Plan that it intended to terminate its participation in the plan and requested that Smith be allowed to purchase his policy. On October 21, 2005, the necessary paperwork, including a general release form and a plan termination and policy transfer release form, was executed. To receive the underlying policy, Smith paid the termination fee of $500 plus 10 percent of the net surrender value of the policy. He also signed a collateral assignment agreement. To calculate the 10-percent fee, Benistar Plan used the net surrender value of the policy as of December 31, 2004, which was $29,704.77, instead of the net surrender value at the time, which was, according to the quarterly statement ending September 30, 2005, $83,158.85.

On November 8, 2005, Benistar Plan and Smith executed a transfer of ownership form, transferring ownership of the underlying policy from Benistar Plan to Smith. Smith did not receive a loan repayment schedule, and he could identify no additional payments to Benistar in connection with the collateral assignment agreement or ownership of the policy. On April 17, 2006, Smith requested a partial withdrawal of $77,300 from his policy. On January 9, 2007, Smith requested a policy loan of $16,000 from his policy.

On March 27, 2007, the IRS sent the Smiths a notice of deficiency determining a deficiency in their 2003 Federal income tax as well as an accuracy-related penalty under section 6662(a). The deficiency stemmed from additional passthrough income to the Smiths from SH Smith Construction, resulting from the disallowance of the company's $177,966 employee-benefit deduction. Respondent now concedes that only $54,750, the amount contributed to Benistar Plan plus the administrative fee, should have been disallowed.

Stephen and Roberta Mogelefsky

Petitioners Stephen and Roberta Mogelefsky resided in New York at the time they filed their petition. Stephen Mogelefsky (Mogelefsky) has an associate's degree in real estate and finance. Mogelefsky was born in 1940.

Mogelefsky has been the president and owner of Discount Funding Associates, Inc., an S corporation, continuously since 1979. The company, at various times, had between 2 and 20 employees. On December 20, 2002, Discount Funding Associates adopted a certificate of resolution electing to enroll in Benistar Plan. It elected to provide life insurance benefits through Benistar Plan to Mogelefsky and his stepson, a manager at the company.

Before enrolling in Benistar Plan, Mogelefsky consulted his accountant, Philip Dedora, who is also the accountant for Discount Funding Associates. Dedora did not conduct research

with respect to Benistar Plan.  Dedora had no particular expertise in welfare benefit plans, nor did he tell Mogelefsky that he had such expertise.  He relied on the opinion of Edwards & Angell in advising Mogelefsky that Discount Funding Associates could claim a deduction for contributions to Benistar Plan. Mogelefsky was aware that Dedora was basing his advice on the Edwards & Angell opinion letter.

Mogelefsky, with the help of his insurance agent, Gary Frisina, selected policies from John Hancock Life Insurance Co. to be purchased by Benistar Plan.  To cover himself, Mogelefsky selected a flexible premium adjustable life insurance policy--a universal life insurance policy--with a death benefit of $1.35 million (Mogelefsky's first policy).  To cover his stepson, Mogelefsky selected a flexible premium universal life insurance policy.  Benistar Plan issued a certificate of coverage dated September 18, 2003, insuring Mogelefsky with a death benefit of $1.35 million, insuring his stepson with a death benefit of $350,000, and listing the enrolled employer as Discount Funding Associates.

On December 16, 2003, Discount Funding Associates adopted a certificate of resolution electing to further participate in Benistar Plan.  It elected to provide additional life insurance benefits to Mogelefsky.  Mogelefsky selected a second flexible premium universal life insurance policy from John Hancock Life Insurance Co. with a death benefit of $1.02 million (Mogelefsky's

second policy).  Benistar Plan issued a certificate of coverage dated December 28, 2004, insuring Mogelefsky with a death benefit of $1.35 million and insuring his stepson with a death benefit of $350,000--the same death benefits as outlined in the certificate of coverage issued in 2003.  The 2004 certificate listed the enrolled employer as Oldfield Management Corp, another S corporation owned by Mogelefsky.

Discount Funding Associates deducted $398,597 on its 2002 Form 1120S corresponding to a contribution to Benistar Plan made in early 2003.  Discount Funding Associates also deducted $354,821 on its 2003 Form 1120S corresponding to a contribution to Benistar Plan made in early 2004.  Discount Funding Associates' 2003 Form 1120S reported that the company had no accumulated earnings and profits at the close of 2003.

Between March 8 and 16, 2006, Mogelefsky and his stepson completed the documents to withdraw from Benistar Plan.  The paperwork included a general release form and a plan termination and policy transfer release form.  To receive the underlying insurance policies, Mogelefsky paid 10 percent of the net surrender value of the policies.  He also signed a collateral assignment agreement, which listed the employer as Oldfield Management Group.  To calculate the 10-percent fee on Mogelefsky's first policy, Benistar Plan used $285,773.41 as the net surrender value.  As of December 22, 2005, the account value was $313,745.43 and the cash surrender charge was $28,330.62,

yielding a net surrender value of $285,414.81. There were no further premium contributions made to the policy. To calculate the 10-percent fee on Mogelefsky's second policy, Benistar Plan used $146,328.15 as the net surrender value. As of December 16, 2005, the account value listed on the insurance policy statement was $166,798 and the surrender charge was $20,803.71, yielding a net surrender value of $145,994.38. As of March 16, 2006, the account value was $255,089.19. As of December 16, 2006, the surrender charge was $19,647.95.

Between March 8 and 16, Benistar Plan and Mogelefsky executed a transfer of ownership form, transferring ownership of the underlying policies from Benistar Plan to Mogelefsky. Mogelefsky did not think that he had borrowed money from Benistar Plan and could not recall signing any loan agreements promising to repay Benistar Plan by a particular time.

On June 25, 2007, the IRS sent the Mogelefskys a notice of deficiency determining a deficiency in their 2003 Federal income tax as well as an accuracy-related penalty under section 6662(a). The deficiency stemmed from: (1) Additional income of $398,597 related to Discount Funding Associates' contribution to Benistar Plan made in 2003 but deducted in 2002, and (2) additional passthrough income of $354,821 from Discount Funding Associates, resulting from the disallowance of the company's deduction of the 2004 contribution.

OPINION

Section 419(a) provides that an employer's contributions to a welfare benefit fund are deductible, but only if they are otherwise deductible under chapter 1 of the Code. The deductibility of an employer's contributions to a welfare benefit fund is further limited by section 419(b) to the fund's qualified cost for the taxable year. Section 419A(f)(6) provides that contributions paid by an employer to a multiple-employer welfare benefit fund are not subject to the deduction limitation of section 419(b).

Petitioners argue that (1) contributions to Benistar Plan are ordinary and necessary business expenses deductible under section 162(a) (which is in chapter 1 of the Code) and (2) Benistar Plan is a multiple-employer welfare benefit plan under section 419A(f)(6), so that the deduction limits of section 419(b) are not applicable.

We first consider whether the contributions made by the participating companies are ordinary and necessary business expenses deductible under section 162(a). We conclude that the contributions are not ordinary and necessary business expenses deductible under section 162(a). Our decision turns on our factual findings regarding the mechanics of Benistar Plan and our conclusion that petitioners had the right to receive the value reflected in the underlying insurance policies purchased by Benistar Plan. Petitioners used Benistar Plan to funnel pretax

business profits into cash-laden life insurance policies over which they retained effective control. As a result, contributions to Benistar Plan are more properly viewed as constructive dividends to petitioners and are not ordinary and necessary business expenses under section 162(a).

We acknowledge that the evidence at trial and the arguments in the briefs in large part deal with Carpenter's attempts to fashion the Benistar Plan to qualify as a welfare benefit plan under section 419. Carpenter was trained as a tax lawyer and studied the evolving regulations issued or proposed under section 419 and the developing caselaw and amended the plan in attempts to secure deductions for the premiums paid by petitioners. He published a book in an attempt to explain the provisions of section 419 to insurance brokers. The parties presented expert testimony and opinions about the nature of Benistar Plan and the underlying policies. Petitioners' expert, however, relied solely on representations by Carpenter, some of which were contradicted by the evidence at trial. Under the circumstances of these cases, exploration of the intricacies of section 419 would not be productive and might be misleading as applied to future cases where the benefits provided did not so clearly exceed ordinary and necessary expenses deductible under section 162. Because we do not interpret section 419A(f)(6), we do not address petitioners' contention that section 1.419A(f)(6)-1, Income Tax Regs., is invalid.

## Retroactive Amendments to Benistar Plan

As a preliminary matter, we note that under the annual accounting system of Federal income taxation, the amount of income tax payable for a taxable year is generally determined on the basis of those events happening or circumstances present during that tax year. See Hubert Enters., Inc. v. Commissioner, T.C. Memo. 2008-46. In these cases, our decision remains the same regardless of whether we consider only the facts and circumstances of the particular year in issue or give effect to the retroactive amendments in Benistar Plan's plan and trust agreement and consider only the final amended plan and trust document.

## Burden of Proof

Section 7491(a)(1) provides that

> If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue.

Petitioners allege that they have satisfied all the prerequisites to the application of section 7491 and, therefore, respondent bears the burden of proof under section 7491(a) with regard to each of the factual issues. Petitioners argue that these cases are similar to McWhorter v. Commissioner, T.C. Memo. 2008-263, and Forste v. Commissioner, T.C. Memo. 2003-103, where the burden of proof was shifted to the Commissioner under section 7491.

Respondent argues that petitioners failed to satisfy the requirements of section 7491(a) because they failed to identify each issue for which they are seeking to shift the burden of proof and they have not introduced credible evidence. The statute requires petitioners to introduce credible evidence with respect to each issue for which they seek to shift the burden of proof. See sec. 7491(a); Blodgett v. Commissioner, 394 F.3d 1030, 1037 (8th Cir. 2005) ("At a minimum, a taxpayer must produce credible evidence as to each material factual assertion necessary to support a claimed deduction before the burden shifts to the I.R.S."), affg. T.C. Memo. 2003-212. The cases petitioners cite support this proposition. In McWhorter v. Commissioner, supra, the burden of proof was shifted to the Commissioner only on the factual issue of whether McWhorter was an independent contractor or an employee. In Forste v. Commissioner, supra, the Court considered whether the taxpayer had introduced credible evidence on an issue-by-issue basis.

Regardless, the burden of proof is determinative only when there is an evidentiary tie. See Estate of Black v. Commissioner, 133 T.C. __, __ (2009) (slip op. at 30); Knudsen v. Commissioner, 131 T.C. 185, 189 (2008). Where there is an evidentiary tie in these cases, we consider whether petitioners have introduced credible evidence on that particular issue in order to shift the burden of proof. However, most of the issues

in these cases may be decided on the preponderance of the evidence.

Ordinary and Necessary Business Expenses

Section 162(a) provides that "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". An expense is a deductible business expense if it (1) was paid or incurred during the taxable year; (2) was for carrying on any trade or business; (3) was an expense; (4) was a necessary expense; and (5) was an ordinary expense. See Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 352 (1971); FMR Corp. & Subs. v. Commissioner, 110 T.C. 402, 414 (1998). Determining whether an expenditure satisfies each of these requirements involves a question of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943).

Petitioners argue in their brief that

It is hard to imagine a more natural and legitimate business deduction than the 'ordinary and necessary' contribution made to a welfare benefit plan by a company to purchase life insurance or other benefits for the benefit of a key employee who may be a shareholder or owner of the business and his/her family.

They miss the point. Purchasing life insurance for the benefit of an employee is, in many circumstances, an ordinary and necessary business expense deductible under section 162(a). See Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 88 (2000) (holding that Neonatology could deduct as ordinary and

necessary business expenses under section 162 contributions that funded current year term life insurance), affd. 299 F.3d 221 (3d Cir. 2002). Petitioners, however, have not presented relevant evidence of the cost of the term life insurance component of the insurance purchased through Benistar Plan.

The record does not allow us to determine petitioners' annual term life insurance cost. See V.R. DeAngelis M.D.P.C. v. Commissioner, T.C. Memo. 2007-360, affd. per curiam 574 F.3d 789 (2d Cir. 2009), cert. denied No. 09-895 (U.S., Mar. 22, 2010); see also Neonatology Associates, P.A. v. Commissioner, supra at 62 n.18. As a rough estimate, however, we consider table I in section 1.79-3, Income Tax Regs., pertaining to group term life insurance, since Benistar Plan used this table to construct the Benistar 419 Funding Calculator. Calculating the cost of annual term life insurance with petitioners' death benefits and accounting for petitioners' ages yields a cost of less than 15 percent of the Benistar Plan contribution for Smith and less than 5 percent of the Benistar Plan contribution for the remaining petitioners. We recognize that while the term rates in table I consider only age, many insurance companies consider additional factors such as health and gender in determining the annual term cost of insuring a particular person and these factors may raise the price of term life insurance. Nonetheless, these estimates are sufficient to show that the Benistar Plan contributions were far in excess of the annual cost of term life insurance coverage.

Petitioners argue that the contributions are not excessive because, according to rates published by the Government, it would cost over $3 million to purchase $1 million in life insurance coverage to age 90 and the contributions to Benistar Plan total significantly less. Petitioners confuse the total cost of term life insurance over a set number of years with the annual cost. The relevant consideration is the amounts of contributions to Benistar Plan in excess of the amounts necessary to fund annual term life insurance. We must consider why petitioners would pay such excess amounts and whether those contributions were ordinary and necessary business expenses or payments to petitioners personally.

Petitioners cite three cases in support of their argument. In the first case, Frahm v. Commissioner, T.C. Memo. 2007-351, we found that an employer may deduct the current cost of health insurance premiums paid to cover an employee's spouse. The Commissioner conceded the deductibility of life insurance payments, and the issue never came before this Court. In Schneider v. Commissioner, T.C. Memo. 1992-24, "The contributions which petitioner made in each of the subject years were computed by an independent actuary in an amount necessary to fund the plan for that year", which contrasts with these cases, where petitioners contributed amounts greater than required to provide them with term life insurance for the year. In Moser v. Commissioner, T.C. Memo. 1989-142, affd. 914 F.2d 1040 (8th Cir.

1990), although we indicated that section 162 did not require contributions to a voluntary employees' beneficiary association (VEBA) be based on actuarial calculations, we did not consider whether contributions in excess of those required to cover the current cost might be construed as a distribution to the taxpayer personally. Personal benefits to the taxpayers are of particular concern here, where the participating companies made contributions exclusively on behalf of their owners that were distributable to the owners at no or low cost.

Petitioners also rely upon Rev. Rul. 69-478, 1969-2 C.B. 29, which is materially distinguishable. Petitioners may retrieve their underlying insurance policies from Benistar Plan at no or low cost. The revenue ruling gives no indication that the employees could retrieve their underlying insurance policies from the group employee benefit trust. Thus, as in Moser v. Commissioner, supra, the revenue ruling does not consider whether contributions in excess of those required to cover the current cost might be construed as a distribution to the taxpayer personally and therefore not be ordinary and necessary business expenses under section 162(a).

We found that contributions to plans similar to Benistar Plan were not deductible under section 162(a) in two previous cases: Neonatology Associates, P.A. v. Commissioner, supra, and V.R. DeAngelis M.D.P.C. v. Commissioner, supra. In Neonatology, Neonatology Associates deducted contributions to a VEBA to

provide life insurance for its employees.  The VEBA invested the contributions in life insurance that could be distributed to a covered employee when that employee was no longer eligible for benefits from the VEBA.  Neonatology substantially overpaid the VEBA for term life insurance, and the Court found "incredible petitioners' assertion that the employee/owners of Neonatology * * * would have caused their respective corporations to overpay substantially for term life insurance with no promise or expectation of receiving the excess contributions back." Neonatology Associates, P.A. v. Commissioner, 115 T.C. at 89. Because in that case the plan participants could, and did, retrieve their policies from the plan, the Court concluded that "the purpose and operation of the Neonatology Plan * * * was to serve as a tax-free savings device for the owner/employees and not, as asserted by petitioners, to provide solely term life insurance to the covered employees."  Id. at 92.  The extra contributions above the cost of term life insurance were essentially distributions to the shareholders of Neonatology Associates and not ordinary and necessary business expenses deductible under section 162(a).

The Court decided similarly in V.R. DeAngelis M.D.P.C. v. Commissioner, T.C. Memo. 2007-360, where a partnership named VRD/RTD enrolled in what purported to be a multiple-employer welfare benefit plan.  The plan was supposed to provide eligible employees with severance benefits and, if elected, life

insurance.  For each year, the partnership deducted the full amount of its contributions to the plan in that year as an ordinary and necessary business expense under section 162(a), and the plan invested the contributions in whole life insurance policies.  The Court found that

> The insurance premiums at hand pertained to the participating doctors' personal investments in whole life insurance policies that primarily accumulated cash value for those doctors personally.  VRD/RTD's contributions to the STEP [Severance Trust Executive Program Multiple Employer Supplemental Benefit Plan and Trust] plan were used to pay the initial year's cost of providing life insurance for each participating doctor and to create an investment fund for the insured within his whole life insurance policy * * *.  As to each investment fund (and as to each insurance policy in general), the insured doctor regarded that fund (and policy) as his own, as did the STEP plan trustee, the STEP plan administrator, and MetLife.  Very little (if any) value in one participating doctor's fund was available to pay to another insured, and any distribution of cash from the STEP plan to a participating doctor was directly related to the cash value of his policy.  In many instances, a participating doctor dealt with his own insurance agent in selecting and purchasing the policy on his life, received illustrations on an assortment of life insurance investments that could be made through the STEP plan, determined the amount of his investment in his life insurance policy, selected the form of the insurance policy to be issued for him (e.g., single whole life versus survivor whole life), and selected his policy's face amount.  * * *

> The use of whole life insurance policies and the direct interactions between the participating doctors and the STEP plan representatives support our finding that the participating doctors in their individual capacities fully expected to get their promised benefits and that any receipt of those benefits was not considered by anyone connected with the life insurance transaction to rest on any unexpected or contingent event.  Each whole life insurance policy upon its issuance was in and of itself a separate account of the

insured doctor, and the insured (rather than the STEP
plan) dictated and directed the funding and management
of the account and bore most risks incidental to the
account's performance.  * * *

V.R. DeAngelis M.D.P.C. v. Commissioner, supra.  The Court
concluded that contributions by VRD/RTD to the plan were
essentially distributions to the partners and were not ordinary
and necessary business expenses deductible under section 162(a).
The Court did not determine whether contributions on behalf of
the office manager were deductible because the Commissioner
conceded the issue.  Id. at n.3.

The facts in these cases are strikingly similar to those in
DeAngelis.  As in DeAngelis, petitioners each personally selected
their individual insurance agents, and together with those
agents, chose the policies to be owned by Benistar Plan.
Petitioners, with their insurance agents, chose the life
insurance company, the type of insurance, and the policy's face
amount and together filled out most of the necessary insurance
forms.  Until the Benistar 419 Funding Calculator was adopted in
2003, petitioners even chose the amount that the participating
companies would contribute to the plan--provided it was greater
than the premiums on the underlying policies they selected.

Petitioners acted as though they owned personally both their
Benistar policies and the underlying policies.  For example, at
their deposition, neither Curcio nor Jelling was able to
articulate a single advantage of obtaining life insurance through

Benistar Plan over owning the underlying policy directly, implying that the issue was one they had not considered. When Curcio's underlying policy was rated, thereby making the premium payments more expensive for Benistar Plan, it was Iandoli, Curcio's insurance agent, who worked to remove the rating with no help from the plan. Solomon, Jelling's insurance agent, selected a mixture of whole life and universal life insurance for the underlying Benistar Plan insurance policy even though the terms of the policy issued to Jelling from Benistar Plan were the same. Curcio and Jelling contributed to Benistar Plan using three different companies between 2001 and 2004, and when asked about this at trial Jelling responded that "the concept to me, and maybe it's just simple, is there are multiple entities owned 50-50 by two partners, we file them all at the same time, the revenue falls through a stream to the bottom line." It was irrelevant to them which of their companies actually made the contribution to Benistar Plan, because they viewed the Benistar policies as their own.

Similarly, on the certificate of coverage for Mogelefsky, the enrolled employer changed from Discount Funding Associates to Oldfield Management Corp between 2003 and 2004. Smith appears to have actively managed the accumulation value in the underlying policy he selected, switching investments three times between 2002 and 2005--despite Carpenter's assurances that covered employees could invest an underlying policy's accumulation value

only in the insurance company's guaranteed fund or the S&P 500 equity index.  Tellingly, on the application for the policy, Smith indicated that his purpose for getting insurance was retirement planning.

Not only did petitioners act as though they personally owned the underlying insurance policies, Benistar Plan itself promoted the implication that it was merely a conduit to the underlying policies and not the actual insurer.  For example, Benistar Plan did not issue Jelling notices of contribution based on the amount of life insurance benefits it provided, but rather based on the number of underlying policies that Jelling selected.  Since Jelling selected two underlying policies, he received two separate notices of contributions, one for each policy.  Further, Benistar Plan took measures to completely hedge its insurance risk, to the point that for a brief period in 2002 the liability of the plan for death benefits was contingent on the underlying policy's payment of death benefits to Benistar Plan.  And although contributions to the plan were deposited in one account, Benistar Plan maintained spreadsheets that allocated every contribution to an employer and a corresponding underlying policy.

Although Benistar Plan is very similar to the employee benefit plan in V.R. DeAngelis M.D.P.C. v. Commissioner, T.C. Memo. 2007-360, it also has a number of important differences. First, Benistar Plan does not permit its covered employees to

borrow against the underlying policy owned by the plan.  Second, and more importantly, starting mid-2002, upon an employer's election to terminate participation in Benistar Plan, the plan began to charge covered employees for withdrawing their underlying policies.  Carpenter testified that from mid-2002 until mid-2005, the withdrawal fee was 10 percent of the policy's net surrender value.  Carpenter testified that after mid-2005, covered employees had to purchase the underlying life insurance policy for its fair market value as outlined in Rev. Proc. 2005-25, supra.  Covered employees received full financing of this payment from Benistar Plan but had to sign a collateral assignment agreement to secure the alleged debt.  Participants still had to pay the 10-percent withdrawal fee, but it was recharacterized as 3 years of prepaid interest on the alleged debt.

It is unclear whether this recharacterization occurred in 2005 or later.  At trial, Carpenter testified that

> If somebody wants to buy their policy we will give them
> a hundred percent financing where they pay interest
> equal to the short-term, mid-term, and long-term rate
> as published by the Treasury every month. We'll charge
> them that interest and then we'll also have them sign a
> collateral assignment for the full [fair market] value.

However, on the plan termination and policy release forms signed by Smith in October 2005 and Mogelefsky in May 2006, the 10-percent fee is still referred to as a "fee" and not as prepaid interest.  And the fee was still calculated using 10 percent of

the net surrender value of the policy and not the fair market value under Rev. Proc. 2005-25, supra.  We also note that, contrary to Carpenter's testimony, a charge of 10 percent over 3 years is roughly equal to an interest rate of 3.22 percent compounded annually, which is much lower than either the short-term, mid-term, or long-term applicable Federal rates for the relevant periods.  In October 2005, when Smith withdrew from Benistar Plan, the applicable Federal rate was 3.89 percent for a short-term loan compounded annually.  Rev. Rul. 2005-66, 2005-2 C.B. 686.  Mid- and long-term rates were higher.  Id.  In March 2006, when Mogelefsky withdrew from Benistar Plan, the applicable Federal rate was 4.58 percent for a short-term loan compounded annually.  Rev. Rul. 2006-10, 2006-1 C.B. 557.  The mid-term rate was 4.51 percent, and the long-term rate was 4.68 percent.  Id.  At no point between September 2005 and May 2006 did the applicable Federal rate drop below 3.22 percent compounded annually.  See Rev. Rul. 2005-57, 2005-2 C.B. 466; Rev. Rul. 2005-66, supra; Rev. Rul. 2005-71, 2005-2 C.B. 923; Rev. Rul. 2005-77, 2005-2 C.B. 1071; Rev. Rul. 2006-4, 2006-1 C.B. 264; Rev. Rul. 2006-7, 2006-1 C.B. 399; Rev. Rul. 2006-10, supra; Rev. Rul. 2006-22, 2006-1 C.B. 687; Rev. Rul. 2006-24, 2006-1 C.B. 875.  Carpenter's testimony is so at odds with the rest of the evidence that we must consider whether he was referring to a completely separate interest charge in addition to the 10-percent

fee.  If he was, petitioners have presented no evidence that such an additional interest charge was documented or was paid.

The 10-percent withdrawal fee/prepaid interest was a fiction.  The fee was calculated using the net surrender value of the policy as of the close of the previous year.  In both Smith's policy and Mogelefsky's second policy, significant contributions were made by Benistar Plan right before those policies were withdrawn from the plan.  These contributions reduced the fee to significantly below 10 percent.  Smith withdrew from Benistar Plan when the underlying policy had a net surrender value of $83,158.85 and he paid $2,970.47, yielding a fee of 3.6 percent.  Mogelefsky withdrew from Benistar Plan when his second policy had an account value of $255,089.19 and an approximate surrender charge of $20,803.71, yielding a net surrender value of $234,285.48.  He paid $14,632.81, a fee of 6.3 percent.  Only the fee charged for Mogelefsky's first policy actually reflected 10 percent of the net surrender value at the time the policy was withdrawn from the plan.

Petitioners claim that Smith and Mogelefsky withdrew their policies after 2005 and paid for the fair market values of the policies under Rev. Proc. 2005-25, supra.  Their "payment", however, was fully financed by Benistar Plan, so in order to determine the amounts paid by Smith and Mogelefsky, we must determine whether bona fide debts existed between Benistar Plan and Smith and Mogelefsky.  This is a question of fact.  See

Beaver v. Commissioner, 55 T.C. 85, 91 (1970); Fisher v. Commissioner, 54 T.C. 905, 909-910 (1970). Debt for Federal income tax purposes connotes an existing, unconditional, and legally enforceable obligation to repay. Hubert Enters., Inc. v. Commissioner, 125 T.C. 72, 91 (2005), affd. in part, vacated in part and remanded on other grounds 230 Fed. Appx. 526 (6th Cir. 2007). There are no loan documents in evidence, and there is nothing to indicate the terms of a loan, such as when the principal is due and what the interest rate is. Nor is there any evidence that Smith or Mogelefsky is liable for interest payments after the first 3 years. The collateral assignment agreements signed by Smith and Mogelefsky, which state that collateral was provided "in consideration of the [Benistar 419 Plan &] Trust agreeing to make certain loans to the Participant in order to purchase the Policy on the Participant's life held by the trust", imply that loans existed, but the agreement does not refer to any particular loan, nor does it mention any loan terms.

"Whether a transfer of money creates a bona fide debt depends upon the existence of an intent by both parties, substantially contemporaneous to the time of such transfer, to establish an enforceable obligation of repayment." Delta Plastics Corp. v. Commissioner, 54 T.C. 1287, 1291 (1970); see Fisher v. Commissioner, supra at 909-910. At trial, neither Smith nor Mogelefsky had any recollection of signing any loan documents. When they were asked about the existence of a loan

issued by Benistar Plan, their testimony was vague and contradictory.  Smith testified that the policy that was collateral for the loan no longer exists, and that he does not recall whether he paid Benistar Plan anything aside from the 10-percent fee.  Assertedly neither Smith nor Mogelefsky, both businessmen, has any specific recollection of a debt of tens of thousands of dollars incurred under 5 years ago.  The evidence leads us to conclude that no debt existed between Benistar Plan and Smith or Mogelefsky.  See Recklitis v. Commissioner, 91 T.C. 874, 890 (1988); Profl. Servs. v. Commissioner, 79 T.C. 888, 916 (1982); see also Sutter v. Commissioner, T.C. Memo. 1998-250.

We therefore conclude that before 2002 Benistar Plan would distribute the underlying insurance policies to covered employees for free.  After 2002, and for all the following relevant years, Benistar Plan would charge a withdrawal fee that was much lower than 10 percent.  Thus petitioners, by causing Benistar Plan to distribute the underlying policies, could easily retrieve the value in those policies with minimal expense.

Petitioners argue that Benistar Plan has over $20 million in forfeitures, a reflection of its rigorous enforcement of its forfeiture policies.  Statistics regarding Benistar Plan operations do not alter how Benistar Plan treated petitioners.  It is also unclear whether the $20 million figure includes amounts due to Benistar Plan from the purported loans issued by the plan to withdrawing employees after mid-2005.

As Carpenter acknowledged, as long as plan participants were willing to abide by Benistar Plan's distribution policies, there was no reason ever to forfeit a policy to the plan. In fact, in estimating life insurance rates, petitioners' expert assumed that there would be no forfeitures, even though he admitted that an insurance company would generally assume a reasonable rate of policy lapse.

After considering the facts and weighing the evidence, we conclude, as we did similarly in V.R. DeAngelis M.D.P.C. v. Commissioner, T.C. Memo. 2007-360, that contributions to Benistar Plan were payments on behalf of petitioners personally and were not ordinary and necessary business expenses under section 162(a). The level of control that covered employees exerted over their underlying policies, the degree to which contributions to Benistar Plan were structured around those underlying policies, and the means through which covered employees could procure a distribution of those underlying policies all lead us to conclude that Benistar Plan is a thinly disguised vehicle for unlimited tax-deductible investments. Because we hold that contributions to the plan are not ordinary and necessary expenses under section 162(a), we also hold that the administrative fees paid to Benistar Plan are not ordinary and necessary expenses under section 162(a).

Petitioners have not argued that they should be entitled to deduct the annual cost of term life insurance purchased through

Benistar Plan, nor have they identified evidence that would enable us to establish that cost. As a result, we find that no part of petitioners' contributions to Benistar Plan is deductible. See V.R. DeAngelis M.D.P.C. v. Commissioner, supra.

Similarly, the record is devoid of information regarding Mogelefsky's stepson. Absent from the record is any information regarding how Mogelefsky's stepson's underlying policy was selected. While Mogelefsky's stepson did sign a collateral assignment agreement, we have already determined that the agreement did not create a bona fide debt. Although it is clear that Discount Funding Associates enrolled Mogelefsky's stepson in Benistar Plan, the record does not allow us to determine what portions of the 2003 and 2004 contributions were for his benefit. Petitioners do not argue that contributions to Benistar Plan on behalf of Mogelefsky's stepson should be treated differently from other contributions. We therefore do not distinguish between contributions for Mogelefsky's benefit and contributions for his stepson's benefit. We find that no part of Mogelefsky's contributions to Benistar Plan is deductible. Cf. id. (holding that because the record was insufficient to establish the term life insurance component of the contribution, no part of the contribution was deductible).

Our interpretation and application of section 162(a) does not undermine sections 419 and 419A, because our conclusion that contributions to Benistar Plan are not deductible is not based

exclusively on our determination that employers cannot claim deductions for plan contributions in excess of the annual cost of benefits. See Schneider v. Commissioner, T.C. Memo. 1992-24. Such deductions are barred by the limitation provisions under section 419(b), not section 162(a). Rather, our decision is based on our finding that contributions to Benistar Plan were payments for petitioners personally, and the large contributions to Benistar Plan, as well as the rest of the evidence discussed above, support this finding. See V.R. DeAngelis M.D.P.C. v. Commissioner, supra.

Finally, we note that our treatment of Benistar Plan is consistent with Booth v. Commissioner, 108 T.C. 524 (1997). In Booth, we decided that the welfare benefit plan failed to qualify as a multiple-employer welfare benefit plan under section 419A(f)(6) because it was really an aggregation of individual plans formed by separate employers. Id. at 570. Booth was decided under section 419A; we do not reach section 419A here because we decide these cases on the basis of section 162. See V.R. DeAngelis M.D.P.C. v. Commissioner, supra.

Respondent argues that in addition to finding that the distributions made by the participating companies are not deductible, we should include Discount Funding Associates' early 2003 contribution to Benistar Plan directly in Mogelefsky's income as a constructive distribution. Sections 1366 through 1368 govern the tax treatment of S corporation shareholders, such

as Mogelefsky, with respect to their investments in such entities. Section 1366(a)(1) provides that a shareholder shall take into account his or her pro rata share of the S corporation's items of income, loss, deduction, or credit for the S corporation's taxable year ending with or in the shareholder's taxable year. Section 1367 provides that basis in S corporation stock is increased by income passed through to the shareholder under section 1366(a)(1), and decreased by, inter alia, distributions not includable in the shareholder's income pursuant to section 1368. Section 1368(b) provides that distributions from an S corporation with no accumulated earnings and profits, like Discount Funding Associates, are not included in the gross income of the shareholder to the extent that they do not exceed the adjusted basis of the stock, and any excess over adjusted basis is treated as gain from the sale or exchange of property. To summarize, section 1366 establishes a regime under which items of an S corporation are generally passed through to shareholders, rather than being subject to tax at the corporate level. See Gleason v. Commissioner, T.C. Memo. 2006-191.

Petitioners argue that respondent is treating Mogelefsky inconsistently because respondent is treating the 2003 contribution and the 2004 contribution under different and contradictory theories. On the one hand, respondent is treating the 2004 contribution as nondeductible, with the result that Mogelefsky must include that amount in income under section 1367.

On the other hand, respondent is treating the 2003 contribution as a constructive distribution, with the result that Mogelefsky must include the amount in income. If both theories were applied to the same contribution, the contribution would be taxed twice-- once under section 1367 and again as a constructive distribution.

Respondent's treatment of Mogelefsky is not inconsistent. As in V.R. DeAngelis M.D.P.C. v. Commissioner, T.C. Memo. 2007-360, our decision turns on our finding that the participating companies' contributions to Benistar Plan were essentially distributions to petitioners of corporate profits and were not deductible under section 162(a). To correct petitioners' mistaken deductions, the income of the participating companies must be increased by their contribution to Benistar Plan, with a corresponding flowthrough of income to petitioners and an increase in petitioners' bases in the shares of their respective companies. See sec. 1367(a)(1) (for the S corporations); secs. 702, 705 (for JELMAC, LLC, a partnership); Briggs v. Commissioner, T.C. Memo. 2000-380 ("Generally, a shareholder's adjusted basis in S corporation stock is increased for his or her share of the pass-through amounts."). The contributions to Benistar Plan, when viewed as distributions, then reduce petitioners' bases in the shares of the participating companies and are not taxed to petitioners a second time. See sec. 1368 (for S corporations); secs. 705, 731 (for JELMAC, LLC, a partnership); V.R. DeAngelis M.D.P.C. v. Commissioner, supra; cf.

Neonatology Associates, P.A. v. Commissioner, 115 T.C. at 95-96 (tax at the shareholder level was appropriate where the employer was a C corporation).

However, Discount Funding Associates' income is not increased by the 2003 contribution because the deduction was claimed in 2002 and we have no jurisdiction to review the tax for that year because the Mogelefskys are not petitioning the Court from a notice of deficiency issued to them for that year. See sec. 6214; Rule 13(a). Although we have no jurisdiction over 2002, we may consider the Mogelefskys' Federal income tax in 2002 to correctly determine their tax liability in 2003. See sec. 6214(b). Because Discount Funding Associates deducted the 2003 contribution in 2002, Mogelefsky did not increase the basis of his Discount Funding Associates stock by that amount. Therefore, to determine the proper treatment of the 2003 contribution, we must determine Mogelefsky's basis in his Discount Funding Associates stock in 2003. See sec. 1368(b).

Petitioners do not argue that Mogelefsky has sufficient basis in Discount Funding Associates to offset the distribution. See sec. 1368(b). Because the record does not permit us to determine Mogelefsky's basis in his Discount Funding Associates stock, we assume that his basis is zero. See Rule 142; Wright v. Commissioner, T.C. Memo. 2007-50; Blodgett v. Commissioner, T.C. Memo. 2003-212, affd. 394 F.3d 1030 (8th Cir. 2005). Under section 1368(b)(2), the amount of Discount Funding Associates'

2003 contribution to Benistar Plan is treated as gain from the sale or exchange of property and is long-term capital gain to Mogelefsky. See secs. 1221 and 1222.

Petitioners argue that the 2003 contribution should not be included in Mogelefsky's 2003 income because the distribution occurred in 2002. Respondent argues that Mogelefsky received the distribution in early 2003, when Discount Funding Associates actually made the contribution to Benistar Plan.

The date of the distribution is the date on which the property is unqualifiedly made subject to the taxpayer's demands. Sec. 1368; sec. 1.301-1(b), Income Tax Regs. Discount Funding Associates was not legally obligated to make the contribution in 2002, nor did it set aside the money in 2002; and therefore the contribution was not unqualifiedly made subject to Mogelefsky's demands in 2002. The actual contribution was made in early 2003, and that is when Mogelefsky was required to account for it. See Avery v. Commissioner, 292 U.S. 210, 214 (1934); Hyland v. Commissioner, 175 F.2d 422, 423-424 (2d Cir. 1949), affg. a Memorandum Opinion of this Court.

Section 6662 Accuracy-Related Penalty

Petitioners contest the imposition of accuracy-related penalties for the tax years in issue. Section 6662(a) and (b)(1) and (2) imposes a 20-percent accuracy-related penalty on any underpayment of Federal income tax attributable to a taxpayer's negligence or disregard of rules or regulations, or substantial

understatement of income tax. Section 6662(c) defines negligence as including any failure to make a reasonable attempt to comply with the provisions of the Code and defines disregard as any careless, reckless, or intentional disregard. Disregard of rules or regulations is careless if the taxpayer does not exercise reasonable diligence to determine the correctness of a tax return position that is contrary to the rule or regulation. Sec. 1.6662-3(b)(2), Income Tax Regs. Disregard of rules or regulations is reckless if the taxpayer makes little or no effort to determine whether a rule or regulation exists. Id.

Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose penalties. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). However, once the Commissioner has met the burden of production, the burden of proof remains with the taxpayer, including the burden of proving that the penalties are inappropriate because of reasonable cause or substantial authority under section 6664. See Rule 142(a); Higbee v. Commissioner, supra at 446-447.

Respondent has met the burden of production. Respondent has shown that petitioners improperly deducted tens of thousands of dollars used to purchase life insurance which could then be redistributed to petitioners for free or for a small fraction of the value of the insurance policy. This evidence is sufficient

to indicate that it is appropriate to impose penalties under section 6662(a).

Petitioners argue that they had substantial authority for their deduction of contributions to Benistar Plan.  Substantial authority exists when "the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment."  Sec. 1.6662-4(d)(3)(i), Income Tax Regs.  Petitioners note that the regulations under section 419A do not provide any safe harbors for multiple-employee welfare benefit plans.  Furthermore, as discussed above, the cases petitioners cite are materially distinguishable.  Other than vague arguments from congressional intent, petitioners have been unable to provide any authority recognized under section 1.6662-4(d)(3)(iii), Income Tax Regs., to support their arguments.  We therefore conclude that petitioners have not shown that there is substantial authority supporting the deduction of contributions to Benistar Plan.

The accuracy-related penalty under section 6662(a) is not imposed with respect to any portion of the underpayment as to which the taxpayer acted with reasonable cause and in good faith.  Sec. 6664(c)(1); Higbee v. Commissioner, supra at 448.  The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  "Circumstances that may

indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Id. Reliance on professional advice may constitute reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991); sec. 1.6664-4(b)(1), Income Tax Regs. A taxpayer cannot avoid the negligence penalty merely by having a professional adviser read a summary of the transaction and offer advice that assumes the facts presented are true. See Novinger v. Commissioner, T.C. Memo. 1991-289.

Petitioners claim that they relied on the tax advice of their accountants. However, there is no evidence that petitioners' accountants had any particular expertise in employee benefit plans or that petitioners thought their accountants had such expertise. See Neonatology Associates, P.A. v. Commissioner, 115 T.C. at 99 (taxpayer must show that the tax adviser was a competent professional who had sufficient expertise to justify reliance). There is no evidence that petitioners' accountants conducted anything other than cursory independent research to determine the deductibility of the contributions to Benistar Plan. Raskin testified that he told Curcio and Jelling that he relied solely on the generic Edwards & Angell tax opinion

in providing his advice.  Similarly Dedora testified that his opinion was also based on the opinion letter from Edwards & Angell and that this was disclosed to Mogelefsky.  The disclosure and acknowledgment form signed by the participating companies expressly acknowledges that they did not rely upon tax advice from Benistar Plan--advice that Raskin and Dedora relied upon in rendering their own opinions.  Smith could not remember his accountant's analysis at all, other than that the deduction was allowed.  Blind reliance on the opinions of accountants given the facts of these cases is insufficient to show that petitioners acted with reasonable cause and in good faith under section 6664.  See Whitmarsh v. Commissioner, T.C. Memo. 2010-83; Zaban v. Commissioner, T.C. Memo. 1997-479 (citing Bollaci v. Commissioner, T.C. Memo. 1991-108); sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners also claim that they relied on the tax advice of their insurance agents.  However, there is no evidence that petitioners' agents were educated in tax law or held themselves out to be tax advisers, or that petitioners believed their agents were educated in tax law.  See Neonatology Associates, P.A. v. Commissioner, supra at 99.

Petitioners, regardless of their formal education, are experienced businessmen.  By the years at issue, Curcio and Jelling had owned car dealerships for over 10 years; Smith had run the painting division of his father's company for 4 years and

owned his own company for 5 years; and Mogelefsky had owned Discount Funding Associates for over 20 years. Yet petitioners failed to conduct thorough research regarding deductions of tens or hundreds of thousands of dollars that were exclusively for their own benefit. Furthermore, some admin packets sent to Benistar Plan enrolled employers listed "virtually unlimited deductions" as a perk of participating in the plan. Carpenter wrote A Professional's Guide to 419 Plans because most financial advisers thought Carpenter's section 419 plans were too good to be true. In these cases, they were. See Neonatology Associates, P.A. v. Commissioner, 299 F.3d at 234; sec. 1.6662-3(b)(1)(ii), Income Tax Regs. (stating that negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction that would seem to a reasonable and prudent person to be too good to be true under the circumstances). Petitioners are not entitled to the reasonable cause and good faith defense under section 6664 because they did not act reasonably in relying on their accountants.

Petitioners argue that their cases are similar to LaPlante v. Commissioner, T.C. Memo. 2009-226, where the Court found that the taxpayer was not liable for the section 6662(a) accuracy-related penalty. LaPlante is similar to these cases in that they involve taxpayers challenging section 6662(a) penalties on the basis of their reliance on expert advice, but the similarities end there. In LaPlante, the taxpayer challenged the

Commissioner's determination that the taxpayer had additional gambling income not reported on her Federal income tax return. As stated earlier, the determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis. Sec. 1.6664-4(b)(1), Income Tax Regs. The facts in LaPlante are so completely unrelated to these cases that it is impossible to draw inferences from the taxpayer in that case to petitioners here.

Petitioners also compare their case to Am. Boat Co., LLC v. United States, 583 F.3d 471 (7th Cir. 2009), where the Court of Appeals for the Seventh Circuit found that the taxpayer reasonably relied on the tax advice of an attorney who structured the transaction at issue. However, the court reached that conclusion by applying the appellate standard of review:

> This is a close case. In the end, we are searching for clear error in the district court's factual determinations, and we are unable to find it. Whether any judge on this panel might have reached a different conclusion after hearing the evidence first-hand is not the appropriate concern. * * *

Id. at 486.

We conclude that petitioners' underpayments of Federal income tax were the result of their negligence or disregard of rules or regulations under section 6662. We also conclude that petitioners are not entitled to the reasonable cause and good faith defense under section 6664 because they did not act reasonably in relying on their accountants.

Petitioners argue that the complexity of the cases and the first-impression issues presented justify abatement of the accuracy-related penalty.  This is not an issue of first impression.  We decide these cases similarly to and on the same principles as Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43 (2000), and V.R. DeAngelis M.D.P.C. v. Commissioner, T.C. Memo. 2007-360.  Even if these cases were without direct precedent, the issue of whether an expenditure by a close corporation is ordinary and necessary under section 162 or a constructive distribution is not novel.  See Neonatology Associates, P.A. v. Commissioner, 299 F.3d at 234-235.  As petitioners note regarding section 162, there is "an arsenal of tax law spanning eight decades."  However, petitioners cannot rely on that "arsenal" because they have not cited any authority that is not materially distinguishable from the circumstances here.  See Antonides v. Commissioner, 91 T.C. 686, 703 (1988), affd. 893 F.2d 656 (4th Cir. 1990).

In reaching our decision, we have considered all arguments made by the parties.  To the extent not mentioned or addressed, they are irrelevant or without merit.

For the reasons explained above,

<u>Decisions will be entered
for respondent in docket Nos.
1768-07 and 1769-07, and
decisions will be entered under
Rule 155 in docket Nos. 14822-07
and 14917-07</u>.